T.C. Memo. 2001-56


UNITED STATES TAX COURT


VICTOR M. BELLO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7678-99.                          Filed March 9, 2001.


<u>Darrell A. Clay</u>, <u>Gary A. Zwick</u>, and <u>Michael J. Jordan</u>, for
petitioner.

<u>Carol A. Szczepanik</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies and
accuracy-related penalties with respect to petitioner's Federal
income tax as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1992 | $57,466 | $11,493 |
| 1993 | 39,669 | 7,934 |
| 1994 | 7,161 | 1,432 |
| 1995 | 36,098 | 7,220 |

After concessions, the issues for decision are:

(1) Whether petitioner is entitled to deduct trade or business expenses under section 162 with respect to his Villa Del Mar hotel venture for 1992, 1993, 1994, and 1995. We find he is entitled to deduct some of the expenses.

(2) Whether petitioner is entitled to a claimed loss deduction for 1992 from Amazona Enterprises, Inc. (Amazona), his wholly owned S corporation. We find that he is not.

(3) Whether petitioner is entitled to claimed partnership loss deductions for 1992 and 1994 from Roadmaster Leasing. We find that he is not.

(4) Whether petitioner is liable for an accuracy-related penalty under section 6662(a) for substantial understatement of income tax for 1992, 1993, 1994, and 1995. We hold that he is liable for a penalty in 1992 for the understatement attributable to his disallowed Villa del Mar business expenses and his disallowed loss deductions from Amazona and Roadmaster Leasing, in 1993 for the understatement attributable to his disallowed Villa del Mar business expenses, and in 1995 for his disallowed Villa del Mar business deductions.

All section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated by this reference.

Petitioner resided in Chagrin Falls, Ohio, when he filed his petition. Petitioner was born in Nicaragua and left there in 1964 to study medicine in Brazil. In 1972, petitioner emigrated to the United States, where he has been a practicing ophthalmologist.

Villa del Mar Hotel Venture

During 1984, petitioner returned to Brazil on a trip with a group of ophthalmologists studying tropical ophthalmology. While on that trip, petitioner visited the Flamingo Beaches area of the City of Salvador in the State of Bahia. Salvador lies on the Atlantic Ocean and is located approximately 1,656 kilometers northeast of Rio de Janeiro. Salvador was the first city founded in Brazil and served as Brazil's first capital. It contains a number of cultural and historical sites, including churches, forts, mansions, and palaces. In addition, the area enjoys a mild climate and has many beaches along the Atlantic coastline. In 1959, a major highway was completed linking the State of Bahia

and Rio de Janeiro.  In the mid-1960's, the State of Bahia began to promote the development of a tourism industry in Salvador.  At some point, an international airport was constructed in Salvador. From 1969 through 1986, the number of domestic and international tourists annually visiting Salvador increased dramatically.  By 1986, an estimated 1.3 million tourists annually visited Salvador, making it the third most visited city in Brazil after Rio de Janeiro and Sao Paulo.  Numerous establishments in Salvador offer hotel and other lodging accommodations to visitors.  These establishments range from five-star hotels to pensions and campgrounds.

During his 1984 visit to the Flamingo Beaches, petitioner was impressed by the scenic beauty and pristine nature of the area.  He examined certain undeveloped lots offered for sale in a recently subdivided large tract of land in the Flamingo Beaches, and he purchased two of those lots to build a summer home. However, he later decided to build a small hotel.  From 1984 through 1986, petitioner purchased a total of 17 contiguous lots in that same tract for the purpose of building his hotel.

Since petitioner resided and conducted his medical practice in the United States, he arranged to have another individual in Brazil supervise the construction of the complex and manage it. Pursuant to this arrangement, petitioner agreed to finance the construction and operation of the hotel but promised to give this

individual, at some unspecified future date, a 20-percent interest in Villa del Mar if the hotel operation proved successful. Petitioner further issued a power of attorney to this individual, authorizing him to act on petitioner's behalf in connection with the construction and operation of the hotel.

In 1986, construction of the 12-cabana-style villa complex called Villa del Mar was completed and opened for business. The 12 cabanas contain two beds in each and are linked together by a series of swimming pools. In addition to the cabanas, the complex has a reception building.

Shortly after the 12-cabana complex had opened for business, petitioner considered the small hotel to be very successful. However, he was unable to realize a profit from the hotel's operation. As a result, petitioner began to consider the possibility of building a much larger hotel on the Flamingo Beaches to accommodate more guests and generate a larger profit.

In March 1988, petitioner commissioned and obtained a study concerning the economic feasibility of expanding the 12-cabana complex into a larger hotel. The expansion project would include the construction of two separate three-story buildings or hotel wings containing a total of 117 additional rooms. The expanded hotel would be a four-star hotel.

Construction of the expansion began later in 1988. Petitioner personally financed the construction with the

expectation that additional future funding would be secured from the Bank of Development, a Brazilian governmental agency then helping private investors develop various tourism-industry-related projects in Salvador.

In mid-1988, the 12-cabana complex was temporarily closed for business due to the disruption caused by the expansion project. The complex was again reopened for business by 1989.

Because of a downturn in the Brazilian economy,[1] petitioner never received the Brazilian governmental funding he had expected for the hotel expansion. Although he then attempted to obtain financing from other sources, including certain sources in the United States, his efforts were unsuccessful. In 1990, petitioner was no longer able personally to finance construction of the hotel expansion or the operation of the 12-cabana complex. Construction on the hotel expansion ceased sometime in 1990. When construction was halted, only the skeleton of one of the planned wings (the concrete and steel "Building A" located east of the 12-cabana complex) had been erected. In 1990, the 12-cabana complex was also closed for business.

From 1986 through 1990, petitioner reported gross receipts,

---

[1]When the March 1988 study on the hotel expansion was issued, petitioner had hoped to finance approximately 51 percent of the project's total cost by obtaining a 6-year loan from the Bank of Development. He originally had obtained the study, in part, to help him in procuring such Brazilian governmental funding.

cost of operations, gross income, expenses, and net loss from
Villa del Mar as follows:

|                    | 1986 | 1987 | 1988 | 1989 | 1990 |
|--------------------|------|------|------|------|------|
| Gross receipts     | $78,696 | $132,635 | $61,854 | $39,984 | $53,282 |
| Cost of operations | (16,337) | (69,957) | (35,934) | (26,006) | (30,489) |
| Gross income       | 62,359 | 62,678 | 25,920 | 13,978 | 22,793 |
| Expenses           | (225,977) | (233,294) | (202,143) | (310,661) | (425,892) |
| Net loss           | (163,618) | (170,616) | (176,223) | (296,683) | (403,099) |

In 1991, petitioner discharged the individual who had been
managing Villa del Mar for dissipating and conveying to third
parties certain assets used in the hotel operation.  At this
time, petitioner was also involved in legal disputes with a
number of unpaid former hotel employees and with the construction
company that had worked on the hotel expansion project.  As a
result, petitioner hired a Brazilian real estate consultant, Vera
Lucia Silvana De Oliveira (Ms. Oliveira), to represent him in
resolving his numerous hotel-related problems.

Until 1993, petitioner continued to seek financing from
other parties to complete the expansion, but he was unsuccessful.
In addition, petitioner expended substantial amounts of money in
connection with resolving various claims that had been made
against him and the hotel property.

On July 1, 1993, petitioner and the construction company
entered into a settlement regarding their dispute.  Petitioner
would convey ownership of the five lots upon which the unfinished
"Building A" stood to the construction company.  Among other
things, the construction company would then complete "Building

A", converting the structure into an apartment/hotel building containing 56 condominium units. Petitioner was to receive seven of those units, and retain ownership of the existing 12-cabana complex.

In a later addendum to their 1993 settlement agreement, the construction company agreed to build a house for petitioner. The house would have a value of $100,000 and would be located on one of petitioner's other Flamingo Beaches lots.

On his income tax returns for 1992 through 1995, petitioner claimed business deductions (some of which are in issue in the instant case) with respect to his Villa del Mar venture for the following specified expenses:

|  | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|
| Depreciation | $2,353 | $2,210 | $2,210 | $2,039 |
| Mortgage interest | -- | -- | -- | 7,200 |
| Other interest | 8,100 | 10,800 | 12,111 | -- |
| Legal, professional services | 65,750 | 52,500 | -- | 560 |
| Supplies | 154 | 215 | -- | -- |
| Taxes | 18,000 | 18,000 | 2,000 | -- |
| Travel | 3,493 | 4,912 | -- | -- |
| Wages | 48,880 | -- | -- | -- |
| Funding fee | 25,000 | -- | -- | -- |
| Legal, professional & mgt. fees | -- | -- | -- | 100,000 |
| Security | 12,000 | 12,000 | 12,000 | -- |
| Telephone | -- | -- | 454 | -- |

In 1999, petitioner and Ms. Oliveira reopened the 12-cabana complex for business as a bed-and-breakfast establishment.

Amazona Venture

In 1991, petitioner was introduced to James Garrett. Mr. Garrett proposed that he and petitioner conduct an entertainment promotion business that would include promoting concerts. Under this proposal, petitioner would finance this venture, and Mr. Garrett would establish and operate the business by arranging to secure the services of various entertainers for bookings or concerts.

On or about May 20, 1991, Amazona, an S corporation, was incorporated to carry out the above venture. Petitioner received and owned 100 percent of Amazona's outstanding shares of stock. At some future date after Mr. Garrett had established a successful entertainment promotion business, petitioner planned to give Mr. Garrett a stock-ownership interest in Amazona.

In early July 1991, petitioner opened an account for Amazona at an Ohio bank. Mr. Garrett was authorized to withdraw funds from this account. Petitioner, on various dates in 1991 and 1992, transferred or deposited funds to this account. Substantially all of the funds ever credited to the account were deposited in 1991, and virtually all of the funds had been withdrawn by Mr. Garrett by the end of 1991.

On its initial 1992 return, Amazona originally reported having an ordinary loss of $20,000. This loss resulted from a deduction of a $20,000 entertainment fee that had been paid

during 1992.  Amazona reported its taxable income on a cash method of accounting.

On an amended 1992 return, Amazona reported an ordinary loss of $48,579.  This loss resulted from payments by Amazona during 1992 for entertainment fees of $47,000, legal fees of $794, travel expenses of $743, and meals and entertainment expenses of $42.

On his 1992 return, petitioner (as 100-percent shareholder of Amazona) claimed a "nonpassive loss" of $28,589 from Amazona. His return reflected Amazona to have had an ordinary loss of $48,579 for 1992, but further stated that only $28,589 of that loss was allowable to him for 1992 after application of the at risk provisions of section 465.

Roadmaster Leasing

In 1992, petitioner met with Lyle Schole, the promoter of a proposed venture called Roadmaster Leasing.  They discussed entering into a limited partnership engaged in the business of buying late-model, used automobiles in the United States to resell in Latin America.  Petitioner further met and discussed the proposed venture with Jose Candelario, an accountant Mr. Schole had retained to perform tax work for Roadmaster Leasing.

Petitioner agreed to invest and purchase a partnership unit in Roadmaster Leasing for $25,000.  On September 21, 1992, petitioner paid $5,000 to Mr. Schole as a downpayment on his

partnership unit.  From 1992 through 1994, petitioner was a partner in Roadmaster Leasing.

As a result of advice petitioner received from another accountant (who was hired to help with the financial management of his medical business and other investments), he made no further capital contributions to Roadmaster Leasing after 1993. This accountant had advised him to end his involvement with Roadmaster Leasing.

On his 1992 return, petitioner claimed an ordinary partnership loss of $5,000 from Roadmaster Leasing.  On his 1994 return, he claimed an ordinary partnership loss of $3,558 from Roadmaster Leasing.  Petitioner attached no information returns for partners with respect to Roadmaster Leasing to his 1992, 1993, and 1994 returns.

The Internal Revenue Service has no record of any business activity, financial operation, or venture that was actually carried on by Roadmaster Leasing from 1992 through 1994. Roadmaster Leasing never filed a partnership return for those years.

Notice of Deficiency

In the notice of deficiency issued to petitioner for 1992, 1993, 1994, and 1995, respondent disallowed various deductions petitioner had claimed from Villa del Mar, Amazona, and Roadmaster Leasing.  The notice of deficiency stated, in

pertinent part:

    1.A.1.  It is determined that the deductions shown on your schedule C [for Villa Del Mar] for the taxable years ending 1992, 1993, 1994 and 1995, in the respective amounts of $144,630.00, $85,500.00, $14,000.00 and $100,000.00 are disallowed, since it has not been established that these amounts were ordinary and necessary business expenses or were expended for the purpose designated.  See the figures below.[2] Accordingly, your 1992, 1993, 1994 and 1995 taxable incomes are increased $144,630.00, $85,500.00, $14,000.00 and $100,000.00, respectively.

| Expenses | 12-31-92 | 12-31-93 | 12-31-94 | 12-31-95 |
|----------|----------|----------|----------|----------|
| Legal | $65,750 | $52,500 | -- | $100,000 |
| Taxes | 18,000 | 18,000 | 2,000 | -- |
| Wages | 48,880 | -- | -- | -- |
| Security | 12,000 | 12,000 | 12,000 | -- |
| Total | $144,630 | $85,500[3] | $14,000 | $100,000 |

    1.A.2.  It is determined that the loss shown on your 1992 return in the amount of $28,589.00 from the small business corporation known as Amazona Enterprises, is disallowed in full.  See Exhibit A for details.  Accordingly, your 1992 taxable income is increased $28,589.00.

    1.A.3.  It is determined that the losses shown on your 1992 and 1994 returns in the respective amounts of $5,000.00 and $3,558.00, from the partnership known as Roadway [sic] Leasing are disallowed, since it has not been established that there were any ordinary and necessary business expenses paid or incurred or that any partnership returns have been filed.

---

[2]As indicated previously, respondent did not challenge certain other Villa del Mar business deductions petitioner had claimed for the years in issue.

[3]The notice of deficiency states expenses for the year ending Dec. 31, 1993, total $85,500.  We note that the correct total is $82,500.

Accordingly, your 1992 and 1994 taxable incomes are increased $5,000.00 and $3,558.00, respectively.

Specifically, with respect to the disallowed Amazona loss, respondent determined that it had not been established that the entertainment fees, legal fees, travel expenses, and meal and entertainment expenses claimed for the S corporation on petitioner's 1992 return were (1) ordinary and necessary business expenses, or (2) expended for the purposes indicated. Respondent further determined that petitioner was liable for a penalty under section 6662(a) for 1992, 1993, 1994, and 1995 for substantial understatements of income tax with respect to the entire underpayment for each year.

OPINION

## Issue 1.  Villa del Mar Business Deductions

Section 162(a) allows a taxpayer a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a business. To be deductible under section 162, an expense must be directly connected with or proximately result from the taxpayer's business. See Kornhauser v. United States, 276 U.S. 145, 153 (1928). Capital expenditures, however, may not be deducted under section 162, but instead, generally must be added to the basis of the capital asset for which they are incurred. See Woodward v. Commissioner, 397 U.S. 572, 574-575 (1970); see also secs. 263, 261, 161. In

particular, whether litigation and other legal costs are classified as deductible business expenses or nondeductible capital expenditures incurred in acquiring or disposing of an asset, depends upon the origin of the claims relating to those legal costs. See Woodward v. Commissioner, supra at 577-578; Dower v. United States, 668 F.2d 264, 266-268 (7th Cir. 1981); BHA Enters., Inc. v. Commissioner, 74 T.C. 593, 598-601 (1980).

Petitioner contends that he has largely substantiated his disputed business expenses.

Respondent, on the other hand, contends that petitioner has failed to substantiate the claimed expenses and has failed to establish that certain of those expenses were not capital expenditures. Respondent notes that capital expenditures include the cost of defending one's title to property. See sec. 1.263(a)-2(c), Income Tax Regs.

With respect to petitioner's claimed deductions for security, wages, and taxes, we are satisfied petitioner has adequately substantiated and established those expenses are not capital expenditures. Petitioner testified that from 1992 through 1994 a security service firm was hired to protect the premises from squatters after the 12-cabana complex was closed for business. He said that this firm was paid $1,000 per month for providing the premises with 24-hour security. Similarly, petitioner testified that the taxes claimed for 1992 through 1994

were real property taxes imposed on the Flamingo Beaches lots. In addition, the record includes a number of 1993 real property tax bills or statements that the Municipality of Salvador had issued with respect to the Flamingo Beaches lots. Finally, with respect to the wages of $48,880 claimed for 1992, petitioner testified that he paid this amount to satisfy the wage and other compensation-related claims of his former hotel employees. Indeed, a report prepared by Ms. Oliveira lists 10 lawsuits that had been brought by these former employees.

We are also satisfied that the wage payments were not capital expenditures. The wage claims had arisen in connection with petitioner's normal operation of his hotel and not in connection with his acquisition or disposition of a capital asset. See BHA Enters., Inc. v. Commissioner, supra at 601. We also reject respondent's suggestion that the settlement payments constitute capital expenditures because petitioner, in these disputes, was defending his title to the hotel property. While any judgments these former employees obtained might have caused a lien to attach to the hotel property, these settlement costs need not be capitalized where the hotel business was the source of the litigation. See id. at 600-601.

Accordingly, we hold that petitioner is entitled to deduct under section 162: (1) For 1992, security services of $12,000, wages of $48,880, and tax expenses of $18,000; (2) for 1993,

security services of $12,000 and tax expenses of $18,000; (3) for 1994, security services of $12,000 and tax expenses of $2,000.[4]

With respect to his claimed 1992 and 1993 legal expenses, petitioner has failed to establish that those expenses were not capital expenditures. Virtually no evidence was offered concerning the nature and origin of the claims involved in these disputes.[5] The record contains no pleadings from these disputes. We are thus unable to determine the origin and character of the claim or claims that were litigated in those disputes. See Dower v. United States, supra. Accordingly, we hold that petitioner is not entitled to deductions under section 162 for his claimed 1992

---

[4]We do not consider respondent's alternative arguments that petitioner is not entitled to deductions because the Villa del Mar venture was actually conducted by a separate Brazilian legal entity, and any deductions petitioner receives are still subject to a 2-percent floor because, following Villa del Mar's closing in 1990, petitioner, at best, only engaged in an investment activity under sec. 212. This separate legal entity issue is a new issue which respondent is attempting to raise for the first time on brief. Similarly, the sec. 212 issue is also a new issue and was not raised either in the notice of deficiency or in respondent's answer.

[5]In February 1996, Ms. Oliveira issued to petitioner an itemized statement of 1992 expenses from Villa del Mar. That statement reflects legal or professional expenses of $65,750 paid for 1992 as follows:

| | |
|---|---|
| Expenses for lawyers (including Court expenses)-- | |
| Dr. Guy Agulha | $36,000 |
| Dr. Themir Batista | 5,750 |
| Expenses related to architect Orlando Regis | 24,000 |

No similar statement was provided for 1993.

and 1993 legal expenses.[6]  See Rule 142(a).[7]

Similarly, as to the claimed 1995 legal expense of $100,000, although petitioner testified this was compensation to Ms. Oliveira, he failed to explain the specific services Ms. Oliveira had rendered in exchange for this payment.  Ms. Oliveira had been hired to represent petitioner in resolving his numerous hotel-related problems, which included a number of legal disputes he had with third parties.  According to petitioner, he had not been paying Ms. Oliveira her monthly fee of $5,000.  Instead, he decided to give her a house valued at $100,000 in payment for her past and future services.  However, as indicated above, any compensation for her past services in dealing with petitioner's legal disputes might be classified as a capital expenditure, depending upon the nature and source of the claims in those disputes.  Moreover, any payment petitioner made for  services in future years could also be a capital expenditure.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 87 (1992) (noting that, although capitalization may not be warranted where there is merely some incidental future benefit, realization of benefits by

---

[6]Furthermore, petitioner claimed that the $24,000 paid to the architect was for new work in revising the hotel expansion to be undertaken once petitioner and the construction company resolved their dispute. If so, that payment would be a capital expenditure.

[7]The record reflects that respondent's examination of petitioner's 1992 through 1995 returns was begun well before 1998.

a taxpayer beyond the year in which the expenditure is incurred is still important in determining whether immediate deduction or capitalization is the appropriate treatment).

We are also not satisfied that petitioner has substantiated this alleged $100,000 "expense". Although the construction company, in a later amendment, agreed to build a home worth $100,000 on petitioner's land, the record does not reflect whether petitioner had actually conveyed this home to Ms. Oliveira or had merely allowed her to live in it rent-free. No deed to her for the home was offered in evidence.

Accordingly, we hold that petitioner is not entitled to deduct under section 162 his claimed legal expense of $100,000 for 1995. See Rule 142(a).

Issue 2. 1992 Amazona Loss[8]

Petitioner argues that he is entitled to deduct a loss of $28,589 claimed from Amazona for 1992. On brief, petitioner maintains that the evidence establishes that Mr. Garrett converted $22,000 which the Ohio Bank had mistakenly credited to Amazona's bank account. Although petitioner essentially acknowledges that Amazona may not have actually had expenses of $48,579 as reported on its amended 1992 return, he now argues

----

[8]Petitioner was Amazona's sole shareholder. See supra p. 9. Petitioner and Amazona thus are not subject to the provisions found in secs. 6241-6245 concerning certain S corporation shareholders' treatment of subchapter S items. See sec. 301.6241-1T(c)(2), Temporary Proceed. & Admin. Regs., 52 Fed. Reg. 3002 (Jan. 30, 1987).

that he has substantiated the following payments on the S

corporation's behalf for the purposes indicated:

| Date | Amount | Payee | Purpose |
|------|--------|-------|---------|
| January 1992 | $794.08 | Edward R. Rycheck | Legal Fees |
| May 1992 | 5,000.00 | James Garrett | Start-up |
| November 1992 | 22,000.00 | Star Bank | Repayment James Garrett Conversion |

Respondent, on the other hand, contends that none of the

$28,589 loss is allowable to petitioner.  Respondent maintains

that petitioner has not adequately substantiated his basis in

Amazona's stock,[9] and Amazona is not entitled to deduct

unsubstantiated expenses not proven to have been incurred in a

trade or business.  We agree with respondent.

It appears that much of the claimed expenses that Amazona

reported for 1992 were actually incurred in 1991.  As reflected

by certain bank statements, virtually all the funds deposited to

Amazona's bank account during 1991 had been withdrawn by Mr.

Garrett before 1992.  The 1991 funds deposited to the account

apparently included $22,000 mistakenly credited by the bank to

the account.  During 1992, only minimal deposits were made to the

account.  Any deductible business expenses Amazona had for 1991

---

[9]In this connection, respondent notes that Amazona was
incorporated in May 1991, substantially all its operating funds
were deposited to its bank account during 1991, and Mr. Garrett
had expended almost all the funds in the account by the end of
1991.  Respondent maintains that, even if petitioner had made
certain capital contributions to Amazona during 1991, his stock
basis would have to be adjusted by the unknown results of
Amazona's operations for 1991.

should have been reported by Amazona on a return covering 1991, not on its initial return filed for calendar year 1992.

There is no evidence in the record to establish that the funds provided by petitioner were actually expended by Mr. Garrett for the purposes stated on the amended 1992 return. That return reflects that Amazona claimed total expenses of $48,579 for entertainment fees, legal fees, travel, and meals and entertainment.

With respect to the claimed legal fees of $794.08, petitioner testified that the payment was for the attorney's services in incorporating Amazona.[10] Such an organizational cost, however, is a capital expenditure not a deductible business expense under section 162. Upon an S corporation's proper election, such organizational costs may only be amortized and deducted by that S corporation's shareholders ratably over a period of not less than 60 months beginning with the month in which the corporation starts business. See sec. 1363(b)(3), 248; secs. 1.248-1(b)(1) and (2), Income Tax Regs. In the instant case, however, no such election was ever made on Amazona's 1992 return.

With respect to the $22,000 petitioner asserts he repaid to

_____

[10]Petitioner originally had expected Mr. Garrett to pay this legal bill using the $5,000 of start-up money that petitioner had deposited in Amazona's bank account in July 1991. Following Mr. Garrett's failure to pay the attorney's bill for the incorporation work, petitioner paid $794.08 to the attorney in 1992.

Star Bank during 1992 as a result of Mr. Garrett's "conversion", the record reflects that the bank had agreed to treat the $22,000 as a loan to petitioner and Mr. Garrett. The record also reflects that the bank was still attempting to collect this loan from Mr. Garrett in late 1992. In any event, no theft loss under section 165 was claimed by either Amazona or petitioner for 1992. We thus do not consider this theft loss issue to be properly before us.

Petitioner has failed to establish he is entitled to deduct a loss of $28,589 he reported from Amazona for 1992. Accordingly, we hold that petitioner is not entitled to deduct the loss he claimed from Amazona for 1992.

Issue 3. 1992 and 1994 Roadmaster Leasing Loss Deductions

Allowability of the Claimed Partnership Losses

As Roadmaster Leasing conducted no actual business activity, financial operations, or venture during 1992 and 1994, petitioner is not entitled to his claimed partnership business losses for those years. On brief, petitioner argues he is still entitled to those losses because he had an actual and honest profit objective in investing in Roadmaster Leasing. However, the claimed partnership business losses are simply not allowable to petitioner where no business activity was actually carried on by Roadmaster Leasing.[11] Accordingly, we hold that petitioner is

---

[11]Petitioner also confuses his own individual intent with
                                                    (continued...)

not entitled to his claimed 1992 and 1994 losses from Roadmaster Leasing.[12]

Issue 4.  Section 6662 Accuracy-Related Penalties

Respondent determined that petitioner was liable for an accuracy-related penalty under section 6662(a) and (b)(2) for substantial understatement of his income taxes for 1992 through 1995.

An understatement of income tax is substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $5,000.  See sec. 6662(d)(1).  Except in the case of an item attributable to a "tax shelter", an understatement is reduced by the portion of the understatement that is attributable to the tax treatment of an item for which there is substantial authority, see sec. 6662(d)(2)(B)(i), or with respect to which there is adequate disclosure, see sec.

---

[11](...continued)
the intent of the partnership.  In order for a partnership to be entitled to a deduction for expenses attributable to a trade or business in computing its taxable income (or loss) under sec. 703(a), it must be established that the partnership engaged in the activity in question with a profit motive.  That profit motive analysis is to be made at the partnership level.  See Brannen v. Commissioner, 722 F.2d 695, 702-705 (11th Cir. 1984), affg. 78 T.C. 471, 499-505 (1982).

[12]On brief, petitioner contends in the alternative, that he should be allowed an abandonment loss under sec. 165.  We do not consider this abandonment loss issue to be properly before us, as petitioner never timely raised this issue and is attempting to do so for the first time on brief.

6662(d)(2)(B)(ii).[13]   See sec. 6662(d)(2)(B) and (C).

In addition, section 6664(c)(1) provides that a penalty under section 6662 shall not be imposed on any portion of an underpayment if the taxpayer shows reasonable cause for such portion of the underpayment and that the taxpayer acted in good faith with respect to such portion.  Reliance on the advice of a professional, such as an accountant, may constitute a showing of reasonable cause if, under all the facts and circumstances, such reliance is reasonable and the taxpayer acted in good faith.  See sec. 1.6664-4(c), Income Tax Regs.

Petitioner asserts that no penalties under section 6662(a) and (b)(2) should be imposed because he qualifies under the section 6664(c)(1) reasonable cause and good faith exception.  Petitioner maintains that he relied upon the accountants who prepared his returns.  In connection with his disallowed 1992, 1993, and 1995 Villa del Mar deductions, petitioner further notes that respondent earlier examined his 1988 return and had fully allowed him all of his claimed 1988 business deductions from Villa del Mar.  We disagree.

---

[13]The Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), Pub. L. 103-66, sec. 13251(a), 107 Stat. 531, amended sec. 6662(d)(2)(B)(ii), to also require a reasonable basis for the tax treatment of the item.  This amendment is effective for returns the due dates for which (determined without regard to extensions) are after Dec. 31, 1993.  See OBRA 1993, sec. 13251(b), 107 Stat. 531.

With respect to petitioner's disallowed Villa del Mar business deductions for 1992, 1993, and 1995 legal expenses, petitioner failed to show he supplied his accountants with complete and accurate information concerning these claimed deductions. To demonstrate reasonable cause, a taxpayer must show that he relied in good faith on a qualified adviser after full disclosure of all necessary and relevant information. See Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). However, in the instant case, petitioner failed to elaborate as to what exactly he had told or had not told his accountants concerning the specific purposes of these legal expenses. See Stark v. Commissioner, T.C. Memo. 1999-1; cf. Test v. Commissioner, T.C. Memo. 2000-362.

With respect to the disallowed Amazona loss deduction of $28,859, we are not satisfied petitioner had disclosed all the relevant facts to his accountants. The bank statements on Amazona's account reflect that many of the claimed expenses were likely incurred in 1991, rather than in 1992. Moreover, many of the claimed expenses (other than the $794.08 in legal expenses) were later shown not to have been expended for the purposes stated on Amazona's and petitioner's 1992 returns.

With respect to the Roadmaster Leasing partnership losses of $5,000 for 1992 and $3,558 for 1994, petitioner testified that he had paid Mr. Candelario (an accountant) $1,000 in 1993 to provide

him with certain tax papers and information on Roadmaster Leasing.  However, Mr. Schole (Roadmaster Leasing's promoter) previously arranged for Mr. Candelario to perform Roadmaster Leasing's tax work.  Indeed, Mr. Candelario had collaborated and jointly participated with Mr. Schole in his sales effort to have petitioner invest in Roadmaster Leasing.  Mr. Candelario was thus hardly a disinterested, objective adviser, and petitioner could not reasonably rely on Mr. Candelario's tax advice in claiming partnership loss deductions from Roadmaster Leasing.  See Rybak v. Commissioner, 91 T.C. 524, 565 (1988).

Accordingly, we hold that for 1992 petitioner is liable for a penalty under section 6662 for substantial understatement of his income tax with respect to the understatement attributable to his disallowed Villa del Mar legal expenses and his disallowed Amazona and Roadmaster Leasing losses.  Similarly, we hold that for 1993 and 1995 he is liable for a penalty under section 6662

for substantial understatement of income tax with respect to the understatement attributable to his disallowed Villa del Mar legal expenses for each year.[14]

Decision will be entered

under Rule 155.

---

[14]Although we have also determined that petitioner did not have reasonable cause with respect to the underpayment attributable to his disallowed 1994 Roadmaster Leasing partnership loss, it does not appear (unless the Rule 155 computation shows otherwise) that he meets the sec. 6662(d)(1) threshold for imposition of a penalty for that year.