# United States Tax Court

T.C. Memo. 2022-52

GENECURE, L.L.C., FRANK Y. TUNG, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 14916-15.                          Filed May 23, 2022.

————————

Frank Y. Tung, pro se.

*John T. Arthur*, *Rubinder K. Bal*, *Rebeccah L. Bower*, *Christopher D. Bradley*, and *Shannon E. Craft*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*:  This TEFRA[1] partnership-level case was heard pursuant to section 6226(a)(1).[2]  Petitioner, Frank Y. Tung (Mr. Tung), seeks review of adjustments made by the Internal Revenue Service (IRS) in Notices of Final Partnership Administrative Adjustment (FPAA) issued to Genecure, L.L.C. (Genecure), for taxable years 2009–12.

The outstanding issues for decision are whether Genecure: (1) had unreported income of $6,000; $21,578; and $7,000 for taxable years

———————————

[1] Before its repeal, TEFRA (the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71) governed the audit and litigation procedures for many partnerships.

[2] Unless indicated otherwise, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulatory references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[*2] 2009–11, respectively,[3] (2) had various deductible business expenses of $180,586; $161,004;[4] $174,229; and $123,963 for taxable years 2009–12, respectively, (3) is subject to a $230,979 recapture tax for excess amounts received as a Qualified Therapeutic Discovery Project (QTDP) grant in taxable year 2010,[5] (4) received a $200,000 loan from a limited liability company member (LLC), Lilly Tung (Mrs. Tung), in taxable year 2009,[6] (5) received a $100,000 capital contribution from Mrs. Tung in taxable year 2011,[7] and (6) is liable for section 6663 civil fraud penalties for any underpayments of tax attributable to fraud for taxable years 2009–12.[8]

We resolve these issues largely in respondent's favor.

## FINDINGS OF FACT

This case was tried in Atlanta, Georgia. The Stipulations of Facts, including the jointly stipulated exhibits contained therein, are incorporated by this reference. At the time Mr. Tung filed the Petition, Genecure's principal place of business was located in Norcross, Georgia.[9]

---

[3] Respondent conceded the determination in the FPAA for taxable year 2012 that Genecure had unreported gross receipts or sales of $388.

[4] Respondent conceded $18,000 in purported business expense deductions (specifically, research and development expenses) previously disallowed in the FPAA for taxable year 2010.

[5] Respondent conceded the determination in the FPAA for taxable year 2009 that QTDP grant recapture should be applied to that year.

[6] The IRS also determined in the FPAA for taxable year 2009 that the loan lacked economic substance—a determination that Mr. Tung challenged in the Petition. However, respondent did not pursue the argument on brief. We therefore deem it abandoned. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003).

[7] Respondent conceded the determination in the FPAA for taxable year 2009 that Genecure failed to substantiate any capital contribution received during that year. Genecure did not report any capital contribution on its return for that year. Respondent also conceded the determination that Genecure failed to substantiate capital contributions from LLC members other than Mrs. Tung in taxable year 2011.

[8] Respondent conceded his alternative determinations in the FPAAs for each of the taxable years at issue with respect to the applicability of accuracy-related penalties under section 6662(a).

[9] Absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Eleventh Circuit. *See* § 7482(b)(1)(E).

[*3] I.   *Genecure and Mr. Tung*

Genecure is a biotechnology firm and is organized as a member-managed LLC.  It is treated as a partnership for federal income tax purposes.[10]  *See* Treas. Reg. § 301.7701-3(b)(1).  Among other things, Genecure was involved in the research and development of a therapeutic vaccine[11] for the disease caused by the human immunodeficiency virus (HIV) that would eliminate the need for antiviral drug treatment for those infected.  It operated primarily out of a facility located at 3150 Corners North Court, Norcross, Georgia (3150 Corners), at all relevant times.

Genecure was founded by Mr. Tung in 1999.  During the taxable years at issue, Mr. Tung possessed the largest ownership interest in Genecure and served as its member manager as well as its tax matters partner (TMP); he also represented himself to be its chief executive officer in dealings with outside parties.  Prior to founding Genecure, Mr. Tung was a professor at multiple academic institutions, including the University of Florida and the University of Pittsburgh.  He earned his bachelor's and master's degrees in Taiwan and completed his doctoral studies in the United States, including postdoctoral research at the Harvard Medical School.

Throughout the taxable years at issue, Genecure paid for various expenses in connection with its research and development activity (e.g., liquid nitrogen, pipettes, enzymes).  Genecure was also engaged in multiple contractual service and collaborative research relationships during this period, including with Georgia State University Research Foundation, Inc. (GSURF), MPI Research, Inc. (MPI), and the University of Miami (UM).  Under an agreement executed in November 2008, Genecure and GSURF entered into a collaborative research relationship whereby Genecure provided funding for research activities in exchange for the use of Georgia State University (GSU) facilities and equipment.  One project sponsored by Genecure under this agreement was SP0000ALW95.  Under an agreement executed in September 2009

---

[10] By extension, members of the LLC are treated analogously to partners in a partnership.

[11] Therapeutic vaccines are nonprophylactic and are designed to treat diseases by eliciting an immune response.  *See* Ctr. for Biologics Evaluation & Rsch., U.S. Food & Drug Admin., *Guidance for Industry: Preclinical Assessment of Investigational Cellular and Gene Therapy Products* 28 (Nov. 2013), https://www.fda.gov/media/87564/download.

[*4] with MPI, Genecure sponsored a toxicity study in rats of an HIV vaccine it had engineered. Lastly, under an agreement executed in July 2011 with UM, Genecure also sponsored a clinical trial study (in humans) to evaluate the safety and immunogenicity of its HIV vaccine;[12] this study started in July 2011 and was carried out by Dr. Margaret Fischl of UM School of Medicine.[13]

Genecure was not a profitable entity during any of the years at issue. Nonetheless, Genecure was not without income. In taxable years 2009–11, respectively, Genecure received $6,000; $20,000; and $7,000 from Washington Biotechnology, Inc. (WBI). These payments were received pursuant to a settlement agreement and as compensation for material damages attributable to WBI's failure to carry out a contracted toxicology study in compliance with applicable federal regulations. In taxable year 2010, Genecure also received two checks totaling $1,578 from Hiroshi and Hiromi Yoshida. This sum of money was received for reagent prepared by Genecure.

II.  *QTDP Program*

In 2010, Congress passed the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010). ACA § 9023(a), 114 Stat. at 877, created an incentive program for small businesses engaged in a QTDP by allowing taxpayers to claim a credit for certain expenses, which was codified at section 48D. This incentive program was only in effect for taxable years beginning in 2009 or 2010, and the credit was computed as 50% of a taxpayer's "qualified investment" in such taxable years in a qualifying project.[14]  *See* § 48D(a), (b)(5). In lieu of a credit, taxpayers were permitted to elect to receive this benefit in the form of a cash grant.[15]  *See* ACA § 9023(e), 114 Stat. at 881. The IRS released I.R.S. Notice 2010-45, 2010-23 I.R.B. 734, to provide taxpayers guidance on the procedures governing application for the QTDP credit or grant.

---

[12] We make no finding whether this HIV vaccine was the same as that under study by MPI.

[13] Dr. Fischl was the director of the medical school's AIDS Clinical Research Unit.

[14] Whether Genecure's HIV vaccine development constituted a qualifying project is not at issue.

[15] This election was particularly beneficial for taxpayers without sufficient income to make use of the credit.

**[*5]** Genecure applied for the QTDP program in 2010 using Form 8942, Application for Certification of Qualified Investments Eligible for Credits and Grants Under the Qualifying Therapeutic Discovery Project Program. Genecure initially applied under the name "GeneCure Biotechnologies"; however, in an amended Form 8942, it applied under the name "GeneCure LLC." Between the initial and amended Forms 8942, there was no difference apart from the variation in applicant name. On the Forms 8942, Genecure reported that its project concerned the development of therapeutic HIV vaccines, and it made elections to receive any credits attributable to qualified investments certified by the IRS in the form of grants. Moreover, it reported qualified investments of $600,000 and $1,060,000 in taxable years 2009 and 2010, respectively.

In a Letter 4615 dated October 29, 2010, the IRS informed Genecure that it had certified $488,958 in qualified investments Genecure reported and that a grant of $244,479 had been approved.[16] The Letter 4615 does not state whether the certified qualified investments related to taxable year 2009, 2010, or both; however, the parties have stipulated that the $244,479 awarded as a grant was attributable to qualified investments reported for taxable year 2009. On November 10 and 16, 2010, respectively, Genecure received electronic transfers of $44,479 and $200,000 to its BB&T Bank account (-1487).

On April 8, 2011, the IRS informed Genecure that as a recipient of a QTDP grant, it was required to amend its tax return for taxable year 2009 by reducing its previously reported deductible expenses and depreciable costs.[17] Genecure responded to the IRS in a letter dated May 8, 2011, stating that it did not believe an amended return for 2009 was necessary. Genecure did not file an amended return for taxable year 2009.

III. *Genecure's Returns at Issue*

Genecure timely filed Forms 1065, U.S. Return of Partnership Income, for the taxable years at issue (i.e., 2009–12).

---

[16] The amount certified was far less than the aggregate $1,660,000 reported qualified investment. Because the QTDP program was oversubscribed and capped at $1 billion for the years in which it was in effect, *see* § 48D(d)(1)(B), the IRS was limited in its ability to certify the full amounts reported by interested taxpayers.

[17] Section 48D(e)(2)(B) denies taxpayers who receive a QTDP credit or grant from also claiming a deduction for the same underlying expenses.

**[\*6]**   A.   *2009 Return*

Among other things, Genecure indicated on its 2009 return that it was a cash method taxpayer and reported (with respect to its trade or business) no items of income; $100,000 in deductible rent expenses; and $80,586 in "other" deductible expenses.  In Statement 1 included with the return, Genecure itemized the "other" deductible expenses as follows: $925 ("Accounting"); $26 ("Bank Charges"); $1,082 ("Dues and Subscriptions"); $3,400 ("Insurance"); $3,234 ("Legal and Professional"[18]); $574 ("Office Supplies"); −$2,027 ("Other Income/ (Expenses)"); $56,279 ("Research & Development"); $3,242 ("Telephone/Internet"); $5,424 ("Travel"); and $8,427 ("Utilities").

Moreover, Genecure reported on Schedule L, Balance Sheets per Books, that it had $200,000 in "Other liabilities" at taxable yearend.  In Statement 3 attached to the return, it indicated that the $200,000 was solely attributable to a loan from Mrs. Tung, who was married to Mr. Tung at all relevant times.  According to the Schedule L, this $200,000 loan was Genecure's only new liability during the taxable year and its only liability as of taxable yearend.

Genecure also attached completed Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., for 28 partners stating their individual tax-basis capital account balances at the beginning of taxable year 2009.[19]  Notwithstanding the reported $200,000 liability at taxable yearend, no portion of the purported loan was allocated among the 28 partners on the respective Schedules K–1.

As stated previously, Genecure did not file an amended return for taxable year 2009 to reduce the deductible expenses it had initially reported and for which it received the QTDP grant.  *See supra* note 17.

B.   *2010 Return*

Among other things, Genecure indicated on its 2010 return that it was a cash method taxpayer and reported (with respect to its trade or business) no items of income; $100,000 in deductible rent expenses; and $79,004 in "other" deductible expenses.  In a statement included with

---

[18] These were all legal expenses.

[19] Relatedly, Genecure reported on Schedule L that the aggregate capital account balance of the 28 partners (for financial accounting purposes) at the beginning of the taxable year totaled $433,113.

[*7] the return, Genecure itemized the "other" deductible expenses as follows: $576 ("Travel"); $480 ("Dues and subscriptions"); $2,343 ("Insurance"); $1,265 ("Legal and professional fees"[20]); $643 ("Supplies"[21]); $3,284 ("Telephone & Internet"); $6,679 ("Utilities"); $58,062 ("Research & Development"); and $5,672 ("Other Expenses").

C.   *2011 Return*

Among other things, Genecure reported on its 2011 return that it was a cash method taxpayer and reported (with respect to its trade or business) no items of income; $100,000 in deductible rent expenses; and $74,229 in "other" deductible expenses.  In a statement included with the return, Genecure itemized the "other" deductible expenses as follows: $1,845 ("Travel"); $960 ("Dues and subscriptions"); $2,429 ("Insurance"); $970 ("Legal and professional fees"); $1,867 ("Supplies"[22]); $2,949 ("Telephone"); $6,702 ("Utilities"); $44,179 ("Research & Development"); and $12,328 ("Tax").

Moreover, Genecure reported on the Schedule K–1 for Mrs. Tung that she had made a capital contribution of $100,000 to the partnership during the taxable year.  On a separate Schedule K–1 for Hsiang-Fen Yin Lin (Hsiang-Fen), Genecure also reported a $100,000 capital contribution to the partnership during the taxable year from that individual.

D.   *2012 Return*

Among other things, Genecure reported on its 2012 return (with respect to its trade or business) no items of income and $123,963 in "other" deductible expenses.  In Statement 1 included with the return, Genecure itemized the "other" deductible expenses as follows: $480 ("Dues and Subscriptions"); $2,487 ("Insurance"); $712 ("Office Supply"); $7,000 ("Auto"); $98,477 ("Research & Development"); $2,486 ("Telephone & Internet"); $6,560 ("Travel"); and $5,761 ("Utility").

IV.   *Examination of Genecure's Returns and Issuance of FPAAs*

Genecure's returns for taxable years 2009–12 were selected for audit.  In May 2012, the IRS assigned Revenue Agent Thomas White

---

[20] These were all legal expenses.

[21] We construe this to mean office supplies.

[22] We construe this to mean office supplies.

**[\*8]** (RA White) as the examining agent of the Genecure examination. RA White worked on the Genecure examination for over two years, after which Revenue Agent Christopher Kittrell (RA Kittrell) took over and closed the case.

While he was still assigned to the Genecure examination, RA White prepared Form 11661, Fraud Development Recommendation – Examination, which was signed by Acting Group Manager Elga Fontanes (Ms. Fontanes) on August 7, 2012. By the time RA Kittrell took over the examination, RA White had already completed the bulk of the exam work. Nonetheless, the Civil Penalty Approval Form in the record was prepared by RA Kittrell. In addition to his own narrative entry explaining the reasoning for the assertion of penalties, RA Kittrell also included a narrative adopted from a lead sheet completed by RA White. On March 19, 2015, Group Manager Sharonne Smith (Ms. Smith) signed the Civil Penalty Approval Form.

On February 20, 2015, RA Kitrell issued to Genecure a Letter 1807 inviting Mr. Tung, in his capacity as TMP, to a closing conference to discuss the IRS's proposed adjustments concerning Genecure's returns for taxable years 2009–12. The proposed adjustments, including imposition of the section 6663 penalties, were detailed in Forms 4605–A, Examination Changes – Partnerships, Fiduciaries, S Corporations, and Interest Charge Domestic International Sales Corporations (Unagreed and Excepted Agreed), and Form 886–A, Explanation of Items. The Letter 1807 collectively referred to these forms as the "summary report" and stated that "[a]ll proposed adjustments [therein] . . . w[ould] be discussed at the closing conference." A closing conference was not ultimately held.[23]

On April 9, 2015, the IRS issued to Mr. Tung (in his capacity as Genecure's TMP) a separate FPAA for each of the taxable years at issue. In pertinent part, the IRS determined that Genecure (1) failed to report income of $6,000; $21,578; and $7,000 for taxable years 2009–11, respectively, (2) was not entitled to deduct purported business expenses

---

[23] Mr. Tung argues that the IRS erroneously denied Genecure a closing conference; however, his allegation is inconsequential as we review this case de novo. *See Prod. House Ltd. P'ship C–23 v. Commissioner*, T.C. Memo. 1992-304, 1992 Tax Ct. Memo LEXIS 327, at \*14. Moreover, absent substantial evidence of unconstitutional conduct (which Mr. Tung has not produced), this Court does not look behind the FPAA to examine the propriety of the IRS's motive, administrative policy, or procedure involved in making the adjustments at issue. *See Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–28 (1974).

[*9] of $180,586; $179,004, *see supra* note 4; $174,229; and $123,963 for taxable years 2009–12, respectively, (3) was subject to $230,979 in QTDP recapture tax with respect to taxable year 2010, *see supra* note 5, (4) failed to establish receipt of a $200,000 loan from Mrs. Tung in taxable year 2009,[24] (5) failed to establish receipt of a $100,000 capital contribution from Mrs. Tung in taxable year 2011,[25] and (6) was liable for a section 6663 civil fraud penalty for any underpayment of tax for each of the taxable years at issue. On June 8, 2015, Mr. Tung filed a Petition in his capacity as TMP, *see* § 6226(a)(1), challenging the aforementioned determinations, which remain outstanding for our review.[26]

## OPINION

I.  *Evidentiary Matters*

As a preliminary matter, the Court must address the admissibility of documentary evidence introduced at trial by Mr. Tung but for which we reserved ruling. The admissibility of Exhibits 76–P, 78–P, 79–P, 83–P, and 89–P remains at issue.[27] Our evidentiary rulings are determined under the Federal Rules of Evidence. *See* § 7453; Rule 143(a).

---

[24] The FPAA for taxable year 2009 does not specifically identify Mrs. Tung or the amount of the loan (i.e., $200,000); it only refers to Genecure's failure to substantiate a loan transaction with a "Dr. Tung." However, on the Form 1065 for that year, Genecure reported that it received a $200,000 loan from Mrs. Tung and that the loan was its only new liability during the taxable year.

[25] The FPAA for taxable year 2011 does not specifically identify Mrs. Tung or the amount of the capital contribution (i.e., $100,000); it only refers to Genecure's failure to substantiate capital contributions from its partners generally. However, the Schedules K–1 included with the Form 1065 for that year indicate that Genecure reported a $100,000 capital contribution from Mrs. Tung.

[26] We note that in the Petition, Mr. Tung did not challenge adjustments made in the FPAA for each of the taxable years at issue for (1) salaries and wages and (2) guaranteed payments to partners. These adjustments either had no net effect on Genecure's ordinary income (taxable years 2009–11) or reduced it (taxable year 2012). Notwithstanding certain statements by the parties in their respective pretrial memoranda suggesting that these adjustments were in dispute, they were not pleaded, tried, or addressed on posttrial brief. Consequently, we do not consider them to be at issue.

[27] Following trial, respondent withdrew his objection to the admission of Exhibit 82–P into evidence. The exhibit is therefore admitted into evidence.

**[\*10]** Under the Federal Rules of Evidence, irrelevant evidence is not admissible. *See* Fed. R. Evid. 402. An item of evidence is relevant to the extent it tends to make a fact more or less probable and such fact is consequential to determining the action. *See* Fed. R. Evid. 401. The Federal Rules of Evidence also prohibit the admission of hearsay evidence unless another provision of the rules therein, federal statute, or other rule prescribed by the Supreme Court provides otherwise. *See* Fed. R. Evid. 802; *see also* Fed. R. Evid. 803 and 804. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c).

With these general principles in mind, we will address the outstanding evidentiary determinations. We sustain respondent's objections with respect to each of the exhibits at issue.

A.     *Exhibit 76–P*

Exhibit 76–P is a purported email exchange that occurred in November 2017 between Mr. Tung and an individual associated with H&R Block. It discusses (hypothetically) the deductibility of rent expense for which a promissory note was issued. Respondent objects to the admission of this document on the basis of relevance and hearsay. We sustain the objection on both grounds. Mr. Tung's question to and the responsive opinion of the individual associated with H&R Block is of no consequence to determining whether the purported rent expenses at issue are in fact deductible.[28] *See* Fed. R. Evid. 401. Moreover, the statements made by the individual associated with H&R Block constitute hearsay, *see* Fed. R. Evid. 801(c), with respect to which Mr. Tung fails to demonstrate the applicability of any exception to the rule against hearsay, *see* Fed. R. Evid. 802; *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 818 (8th Cir. 2010) (holding that the party opposing a hearsay objection bears the burden of demonstrating the applicability of a hearsay exception).

---

[28] To the extent this document speaks to Mr. Tung's section 6664(c)(1) reasonable cause defense raised in the Petition, this defense was pleaded only with respect to the alternatively asserted section 6662(a) accuracy-related penalties, which respondent conceded prior to trial. *See supra* note 8. Nonetheless, we note that the exchange reflected in this exhibit took place in 2017. As the taxable years at issue predate this exchange by several years, it would have no tendency to prove that Genecure relied on the advice of a professional tax preparer for the returns at issue from which the asserted section 6663 civil fraud penalties stem. Consequently, it would be irrelevant for purposes of a section 6664(c)(1) reasonable cause defense to such penalties. *See* Fed. R. Evid. 401.

[*11]  B.    *Exhibit 78–P*

Exhibit 78–P is a collection of purported correspondence between the IRS and Genecure.  Mr. Tung offers this material to illustrate alleged mistreatment by the IRS (including its denial of a closing conference) and claims that the material demonstrates Genecure's cooperation with the IRS during the examination.  Respondent objects to the admission of this material on the basis of relevance.  We sustain the objection on this ground.  Even assuming arguendo the veracity of Mr. Tung's claims as to these documents, they have no bearing on the issues tried and for which we must render a decision.  *See supra* note 23.  Thus, the factual allegation these documents are offered to establish is inconsequential to the determination of this action and therefore renders them irrelevant.  *See* Fed. R. Evid. 401.

C.    *Exhibit 79–P*

Exhibit 79–P consists of (1) a purported affidavit executed on February 26, 2014, concerning a call from RA White on February 21, 2014, and (2) purported minutes prepared by an unidentified individual from a meeting between associates of "Genecure Alliance LLC" and RA White on February 19, 2014.  Mr. Tung claims that this document demonstrates IRS misconduct during the examination.  Respondent objects to the admission of this material on the basis of authenticity, hearsay, and relevance. We decline to opine on the first two grounds but sustain the objection on the basis of relevance.  Similar to Exhibit 78–P, the affidavit and meeting minutes bear no nexus with any issue tried and for which we must render a decision.  Thus, the factual allegation these documents are offered to establish is inconsequential to the determination of this action and therefore renders them irrelevant.  *See* Fed R. Evid. 401.

D.    *Exhibit 83–P*

Exhibit 83–P is a warning letter issued to WBI by the Food & Drug Administration regarding a facility inspection that it concluded on October 3, 2008.  The warning letter indicates that WBI violated federal regulations concerning good laboratory practices with respect to certain nonclinical studies.[29]  Mr. Tung offers this evidence in order to establish that the payments received from WBI in taxable years 2009–11 were refunds for studies Genecure had contracted to WBI.  Respondent

---

[29] Identifying information regarding these studies is redacted.

**[\*12]** objected to the admission of this evidence at trial on the basis of hearsay. For the first time on brief, respondent also objected to the admission of this evidence on the basis of relevance.

The warning letter constitutes hearsay. *See* Fed R. Evid. 801(c). Moreover, Mr. Tung did not otherwise invoke the applicability of any exception to the rule against hearsay. *See Brunsting*, 601 F.3d at 818. We therefore sustain respondent's objection on that basis and decline to further address respondent's relevance objection.

E.     *Exhibit 89–P*

Exhibit 89–P consists of two pages of correspondence between Genecure and the IRS. These documents are also constituent pages of Exhibit 78–P, with respect to which we sustained respondent's relevance objection. Mr. Tung offers Exhibit 89–P to establish that the IRS denied him (as TMP) a closing conference. Respondent objects to the admission of this material on the basis of relevance, which we sustain. As a factual matter, the denial of a closing conference is inconsequential to the determination of the issues pending before the Court. *See supra* note 23. Consequently, these documents are irrelevant. *See* Fed. R. Evid. 401.

For the reasons elaborated upon above, Exhibits 76–P, 78–P, 79–P, 83–P, and 89–P are not admitted into evidence.

II.     *Burden of Proof*

The adjustments rendered in an FPAA bear a presumption of correctness, *see, e.g., Welch v. Helvering*, 290 U.S. 111, 115 (1933), and the taxpayer generally bears the burden of proving erroneous the adjustments at issue in proceedings in this Court, *see* Rule 142(a)(1). However, respondent does not bear the burden of production with respect to penalties in a partnership-level proceeding. *See* § 7491(c); *Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 236 (2018).

III.     *Evaluation of Mr. Tung as a Testifying Witness*

As the finder of fact:

> We observe the truthfulness, sincerity, and demeanor of each witness to evaluate his or her testimony. We then assign weight to that testimony for the primary purpose of finding disputed facts based on the record as a whole. In

**[\*13]** the light of that testimony, we weigh the evidence, make appropriate inferences, and find what we believe to be the truth. We are "careful to avoid making the courtroom a haven for the skillful liar . . . ."

*Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 2011 Tax Ct. Memo LEXIS 226, at \*41 (citations omitted) (quoting *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972)), *aff'd*, 521 F. App'x 476 (6th Cir. 2013).

We generally found Mr. Tung's testimony self-serving, evasive, conflicted, and at times, improbable.[30]

IV.    *Unreported Income*

Section 61(a) provides that gross income means all income from whatever source derived unless specifically excluded by another provision of the Code. It includes gross income derived from business. § 61(a)(2). To the extent a given amount does not fall within a statutorily enumerated category of gross income, gross income is construed broadly. *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) (holding that gross income includes any accession to wealth, clearly realized, over which the taxpayer has complete dominion). Furthermore, this Court has previously concluded that settlement proceeds that do not otherwise satisfy an exclusionary provision of the Code constitute gross income. *See, e.g., George v. Commissioner*, T.C. Memo. 2016-156, at \*5–6, \*10.

As stated previously, the adjustment(s) reflected in an FPAA bear a presumption of correctness. *See Welch v. Helvering*, 290 U.S. at 115. However, in order for the presumption to apply with respect to unreported income, the Commissioner must produce some minimal evidentiary foundation. *See Blohm v. Commissioner*, 994 F.2d 1542, 1548–49 (11th Cir. 1993) (citing *Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977)), *aff'g* T.C. Memo. 1991-636. In the present case, respondent has produced the underlying checks received by Genecure, and Genecure's BB&T Bank account (-1487) statements confirm its receipt of those amounts. Consequently, the presumption of correctness applies to the unreported income adjustments in question. *See id.*; *see also Tokarski v. Commissioner*, 87

---

[30] We also acknowledge that some of Mr. Tung's testimony is at odds with representations he made on brief.

**[\*14]** T.C. 74, 77 (1986) ("A bank deposit is prima facie evidence of income . . . .").

With respect to the $1,578 received from Hiroshi and Hiromi Yoshida in taxable year 2010 for the preparation of reagent, the Court finds that such payments constitute gross income derived from Genecure's business activity. As Mr. Tung has not demonstrated the applicability of any exclusionary provision of the Code, these payments are taxable. *See* § 61(a)(2). Mr. Tung disputes that the $1,578 should be so characterized and argues, without evidence, that the payments were received as reimbursement for material and shipping costs. To the contrary, however, the Court notes Mr. Tung's characterization of the payments as "service revenue" and "a fee" at trial. Furthermore, the two checks totaling $1,578 do not suggest in any way that they were for reimbursement of material or shipping costs; rather, they indicate that they were in fulfillment of certain order numbers.[31] Thus, the Court rejects Mr. Tung's characterization of these payments as reimbursement.[32]

With respect to the $6,000; $20,000; and $7,000 received from WBI in taxable years 2009–11, respectively, the Court concludes that these payments also constitute gross income. These amounts were received as compensation for material damages caused by WBI's breach of contract (i.e., its failure to carry out a toxicology study in compliance with applicable federal regulations), and Mr. Tung did not otherwise demonstrate the applicability of any exclusionary provision of the Code. Consequently, they constitute gross income and are taxable. *See George*, T.C. Memo. 2016-156, at \*10. Although Mr. Tung acknowledges that these payments were settlement proceeds, he simultaneously argues that these payments were refunds. Despite the inconsistent positions, the documentary evidence confirms that these payments are settlement proceeds intended to compensate for damages attributable to WBI's failure to comply with applicable federal regulations. Thus, the Court rejects Mr. Tung's characterization of these payments as refunds.

---

[31] The "For" lines on the $500 and $1,078 checks reference "order # cv2010-1" and "order # cv2010-2," respectively.

[32] To the extent Genecure paid deductible expenses in producing the reagent, such expenses must be properly reported on Form 1065 and duly substantiated.

**[\*15]** In sum, the Court sustains the unreported income adjustments totaling $6,000; $21,578;[33] and $7,000 for taxable years 2009–11, respectively.

V.    *Business Expense Deductions*

Section 162(a) permits a deduction for ordinary and necessary expenses paid to carry on a trade or business during the taxable year. An expense is ordinary if it is normal or customary within the particular trade, business, or industry of the taxpayer. *See Welch v. Helvering*, 290 U.S. at 114. An expense is necessary if it is appropriate and helpful. *Id.* at 113. Relatedly, section 174(a) permits a taxpayer to deduct research and experimental expenses paid in connection with his trade or business.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of clearly showing his entitlement to any deduction claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Under that burden, the taxpayer must substantiate the amount and the purpose of the expense underlying the deduction. *See Higbee v. Commissioner*, 116 T.C. 438, 440 (2001). A taxpayer must also maintain adequate records to demonstrate the propriety of any deduction claimed. *See* § 6001.

Certain expenses otherwise deductible under section 162(a) are subject to heightened substantiation requirements under section 274(d); these include expenses for travel (including meals and lodging) and expenses with respect to any listed property under section 280F(d)(4). *See* § 274(d)(1), (4). No deduction is permitted for personal, living, or family expenses unless expressly permitted under the Code. *See* § 262(a).

If a taxpayer is unable to substantiate the amount of a deduction, the Court may nonetheless allow it (or a portion thereof) if there is an evidentiary basis for doing so. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). In estimating the amount of an allowable expense under the *Cohan* rule, the Court bears heavily against the taxpayer whose inexactitude is of his own making. *Id.* at 544. The *Cohan* rule cannot be applied to deductions subject to the strict

---

[33] This amount comprises the WBI payments (i.e., $20,000) and the payments from Hiroshi and Hiromi Yoshida (i.e., $1,578).

[*16] substantiation requirements of section 274(d).  *See* Temp. Treas. Reg. § 1.274-5T(a) (flush language).

With these general principles in mind, we address the deductibility of the various business expenses reported by Genecure on its Forms 1065 for the taxable years at issue.  For the sake of clarity, we summarize them in the table below.

|  | *2009* | *2010* | *2011* | *2012* |
|---|---|---|---|---|
| Rent | $100,000 | $100,000 | $100,000 | -0- |
| Accounting | 925 | -0- | 600[34] | -0- |
| Legal | 3,234 | 1,265 | 370 | -0- |
| Banking | 26 | -0- | -0- | -0- |
| Dues[35] | 1,082 | 480 | 960 | $480 |
| Insurance | 3,400 | 2,343 | 2,429 | 2,487 |
| Office supply | 574 | 643 | 1,867 | 712 |
| Telephone and internet | 3,242 | 3,284 | 2,949 | 2,486 |
| Travel | 5,424 | 576 | 1,845 | 6,560 |
| Utility | 8,427 | 6,679 | 6,702 | 5,761 |
| Tax | -0- | -0- | 12,328 | -0- |
| Automobile | -0- | -0- | -0- | 7,000 |
| Other[36] | (2,027) | 5,672 | -0- | -0- |
| Research and development | 56,279 | 40,062[37] | 44,179 | 98,477 |
| Total | $180,586 | $161,004 | $174,229 | $123,963 |

---

[34] On its Form 1065 for taxable year 2011, Genecure reported $970 as "legal and professional fees."  Upon review of the record, it is readily apparent that $600 was for accounting expense and $370 for legal expense.  We separate these sums to facilitate our analysis.

[35] On each of the returns at issue, Genecure referenced "dues and subscriptions" with respect to these amounts; however, the record indicates that they were all for purported dues to Corners North Association.

[36] On brief, Mr. Tung stated that $2,000 of the reported $2,027 for taxable year 2009 was reported by Genecure in error and provided no explanation as to the remaining $27.  We thus construe the entire amount reported (i.e., −$2,027, *see supra* Findings of Fact Part III.A) for 2009 as conceded.  *See Mendes*, 121 T.C. at 312–13. Mr. Tung similarly did not identify on brief the constituent components of the $5,672 reported for taxable year 2010.  Consequently, we also deem this reported amount as conceded.  *See id.*

[37] Genecure reported a total of $58,062 on its Form 1065 for taxable year 2010, which the IRS disallowed in full.  On brief, respondent conceded $18,000 in research and development expenses for two payments to MPI made during that year.

**[\*17]**  A.   *Rent Expenses*

Section 162(a)(3) explicitly provides that a rental expense paid for property used in a trade or business is deductible as an ordinary and necessary business expense.  Nonetheless, a cash method taxpayer may only deduct an expense that is actually paid during the taxable year. *See Saviano v. Commissioner*, 80 T.C. 955, 964 (1983) ("It is clear that a cash basis taxpayer cannot deduct an expense incurred unless it has been paid during the taxable year." (citing Treasury Regulation § 1.461-1(a)(1))), *aff'd*, 765 F.2d 643 (7th Cir. 1985); *see also* § 446(a); Treas. Reg. § 1.446-1(c)(1)(i) ("Expenditures [by cash method taxpayers] are to be deducted for the taxable year in which actually made.").  Consequently, a cash method taxpayer may claim a deduction under section 162(a) for a rental expense only to the extent it is actually paid during the taxable year.  A rental expense paid with a promissory note executed in lieu of cash payment may be deducted only when the note is satisfied.  *See Helvering v. Price*, 309 U.S. 409, 413 (1940).

At issue are Genecure's reported rental expenses for 3150 Corners totaling $100,000 for each of taxable years 2009–11.  Respondent argues that any deductions for the reported expenses must be disallowed because Genecure did not pay any such expenses during those years.  Mr. Tung counters that Genecure paid these sums through a $200,000 "loan."[38]

Upon review of the record, we find no credible evidence to suggest that Genecure ever received a loan, let alone paid rental expenses with the funds.[39]  Although Mr. Tung produced a document generated on Genecure letterhead and titled "Loan Agreement" (purportedly executed on December 1, 2009, and signed only by Mr. Tung on behalf of Genecure), the substance of that document indicates that it is a promissory note made to "Tu, Su-Ching" (Tu).  An undated handwritten note on that document states that "[t]he purpose of th[e] loan is to pay

---

[38] Mr. Tung did not explain the discrepancy between the total reported rental expense of $300,000 and the $200,000 principal amount of the purported loan.

[39] The record includes copies of unnegotiated checks totaling $200,000, which were initially produced by Genecure to substantiate rental expenses for 2009 and 2010 during the IRS examination.  Mr. Tung did not allege in this action that these unnegotiated checks substantiate the rental expenses at issue.  He specifically alleged on brief that "a loan was negotiated *in lieu of checks* due to unanticipated insufficient fund[s]."  (Emphasis added.)

**[\*18]** the rent of year 2009–10.  Money was directly transferred to the landlord."

The Court does not find this document to be credible evidence of a loan or of a promissory note to pay rent.  The document itself appears indifferent to the nuance between a loan and a promissory note.[40] Although there is a promise to pay Tu $200,000, nothing in the document indicates Tu's *lending of money* to Genecure, notwithstanding the document's title (i.e., "Loan Agreement") and the handwritten note's characterization of the document as a "loan."  Moreover, the document bears no interest rate, maturity date, or other term or covenant beyond Genecure's promise to pay $200,000.  Neither is there any testimony or affidavit from Tu confirming that a loan or a promissory note was executed to pay rent.  Lastly, none of Genecure's bank statements (across four accounts) reflects receipt of $200,000 from Tu, which belies Mr. Tung's allegation of the existence of a loan.  We therefore find that there was no loan or promissory note to pay rent of $200,000. Consequently, the Court sustains respondent's disallowance of Genecure's reported rental expenses of $100,000 for each of taxable years 2009–11.

Even assuming arguendo that the purported loan document constitutes a legitimate promissory note[41] to pay $200,000 to Tu for rent, the Court would nonetheless sustain the disallowance of the reported rental expenses.  First, the promise to pay is made to Tu; however, Tu was not the legal owner of 3150 Corners.  At trial, Mr. Tung testified that legal title to the property was under his and Mrs. Tung's names.  It is therefore inconceivable that the purported note was executed for purposes of paying rent.  The Court also notes the added layer of inconsistency between executing a promissory note to Tu and the identity of the lessor on the purported rental agreement, "Lo, Wan Yu" (Yu), that was allegedly in effect during the relevant years at issue.[42]

---

[40] A loan involves an act of lending (typically money) to a borrower, whereas a promissory note is merely a promise to pay a sum of money.  *See Loan*, *Promissory note*, Black's Law Dictionary (9th ed. 2009).

[41] As stated earlier, the substance of the purported loan agreement indicates that it is a promissory note, not a loan.

[42] The only rental agreement offered by Mr. Tung with respect to 3150 Corners was executed in 2008 and appears to be a periodic tenancy.  Given the incongruity between the lessor identified therein (Yu) and the legal title holders of 3150 Corners (Mr. and Mrs. Tung), we do not find this purported rental agreement to be credible evidence.

**[\*19]** Second, as a matter of law, Genecure could not deduct expenses paid with a promissory note until it satisfied the obligation because it was a cash method taxpayer during each of taxable years 2009–11. *See Helvering v. Price*, 309 U.S. at 413. Mr. Tung produced no evidence that any portion of the obligation was satisfied in the relevant years, and by his own admission, Genecure satisfied the note in taxable year 2012.[43]

For the reasons elaborated upon above, the Court sustains the disallowance of the $100,000 claimed rent expense deduction for each of taxable years 2009–11. Moreover, we will not apply the *Cohan* rule given the lack of credible evidence.

### B. *Accounting Expenses*

At issue are $925 and $600 in accounting expenses for the preparation of Genecure's tax returns,[44] which it reported for taxable years 2009 and 2011, respectively. Mr. Tung has satisfied his burden of substantiating that Genecure paid such costs for accounting services in taxable years 2009 and 2011. The record includes a copy of a check and an invoice for the $925 and the $600, respectively. Moreover, Genecure's BB&T Bank account (-1487) statements corroborate the payment of these amounts. The amounts reported have therefore been substantiated, and the business purpose of each expense is self-evident. The Court will consequently allow Genecure to deduct these expenses under section 162(a).

### C. *Legal Expenses*

Under section 263(a), a capital expenditure generally may not be deducted for the taxable year in which it is paid, notwithstanding the fact that it may otherwise be an ordinary and necessary expense paid to carry on a trade or business. *See* § 161 (providing that the deductions allowed under part VI, which includes section 162, are subject to the exceptions provided in part IX, which includes section 263). A capital

---

[43] The Court acknowledges that a $200,000 international wire transfer was made to Tu from Genecure's Piedmont Bank account (-2665) on June 11, 2012. Nonetheless, we decline to find, as a matter of fact, that the transfer was made to satisfy a promissory note in payment of rent. Just days before the transfer, the IRS met with Mr. Tung for the first time in his capacity as Genecure's TMP and questioned him regarding the reported rental expenses. At that time, Genecure did not allege that it had executed a $200,000 promissory note on December 1, 2009, to pay rent.

[44] The services appear to have been rendered for Genecure's returns for taxable years 2008 and 2010.

[*20] expense is one that either (1) creates or enhances a separate and distinct asset or (2) otherwise generates significant benefits beyond the taxable year. *See Mylan, Inc. & Subs. v. Commissioner*, 156 T.C. 137, 149 (2021).

In pertinent part, the regulations promulgated under section 263 provide that "[a] taxpayer must capitalize amounts paid to a governmental agency to obtain, renew, renegotiate, or upgrade its rights under a trademark, trade name, copyright, . . . or other similar right granted by that governmental agency." *See* Treas. Reg. § 1.263(a)-4(d)(5)(i). Although "patent" is not expressly enumerated under Treasury Regulation § 1.263(a)-4(d)(5)(i), we construe it to be a "similar right" for purposes of the regulation given its intangible nature and its conferral of a government sanctioned property right.

In addition to amounts paid to a governmental agency to obtain or renew a patent, a taxpayer must capitalize any amounts paid to facilitate the acquisition or creation of such an intangible. *See id.* paras. (b)(1)(v), (e)(1)(i). Consequently, fees paid for legal services ancillary to the renewal of a patent must also be capitalized. *Id.* However, if such costs in the aggregate do not exceed $5,000 in a given taxable year, they are deemed de minimis and are not treated as facilitative costs subject to capitalization. *See id.* para. (e)(4)(i), (iii).

At issue are $3,234; $1,265; and $370 in legal expenses paid in taxable years 2009–11, respectively. These amounts comprise both fees for renewal[45] of foreign patents and fees for legal services in connection with a foreign patent renewal. With respect to the portion of legal expenses Genecure paid to renew its foreign patents, these expenses are capital expenditures and are not immediately deductible. *See id.* para. (d)(5)(i). These expenses totaled $900; $1,265; and $370 in taxable years 2009–11, respectively. The Court therefore sustains the disallowance of deductions for these amounts.

The remaining $2,334 paid for legal services in taxable year 2009 in connection with the renewal of a foreign patent is de minimis and therefore does not need to be capitalized. *See id.* para. (e)(4)(i), (iii). Moreover, Mr. Tung adequately substantiated Genecure's payment for such services by producing underlying invoices, an email exchange with

---

[45] Some of the relevant documentary evidence with respect to these payments references "annuity" payments. In this context, "annuity" refers to a maintenance or renewal fee for the patent. *See Annuity*, Black's Law Dictionary (9th ed. 2009).

**[\*21]** its counsel discussing fees, and corroborating BB&T Bank account (-1487) statements.  Because we also find the business purpose of such expenses self-evident, the Court holds that the $2,334 paid in taxable year 2009 for legal services may be deducted under section 162(a).

### D.  *Banking Expense*

At issue is a $26 fee Genecure paid to BB&T Bank with respect to a certain checking account transaction.[46]  Mr. Tung offered no explanation or evidence regarding the nature of the underlying transaction for which the fee was imposed.  Without such an explanation and supporting evidence, the Court cannot determine whether the $26 is an ordinary and necessary business expense, as it is part and parcel to the underlying transaction.  Consequently, Mr. Tung failed to satisfy his burden of establishing Genecure's entitlement to a deduction therefrom.  *See INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84.  The Court sustains the disallowance of a deduction for this expense.

### E.  *Dues Expenses*

At issue are $1,082; $480; $960; and $480 purported payments to Corners North Association in taxable years 2009–12, respectively.  Mr. Tung characterizes these payments as business park association dues (presumably for the upkeep and maintenance of communal portions of the broader development in which 3150 Corners is situated).

Although the reported amounts appear to have been debited to Genecure's BB&T Bank account (-1487) pursuant to check numbers identified by Mr. Tung, the Court nonetheless sustains the disallowance of deductions for these amounts as we are not persuaded of the credibility of the underlying invoices.

The invoices offered list as Corners North Association's address and telephone number the same address and telephone number as those for Genecure.  They also identify Mr. Tung as the association's point of contact.  We are suspicious of this juxtaposition and find that the invoices lack credibility.  In the absence of other relevant evidence, we conclude that Mr. Tung failed to substantiate these purported expenses.

Even assuming arguendo that these payments were legitimate business park association dues, the Court would sustain the

---

[46] The description line on the relevant BB&T Bank account (-1487) statement references "CHECK CHRG HARLAND CLARKE GENECURE LLC."

[*22] disallowance of the amounts at issue because Mr. Tung has not established that they constitute ordinary and necessary business expenses. As stated previously, Mr. and Mrs. Tung, not Genecure, owned 3150 Corners. It is thus implausible that Genecure would be liable for these amounts as a tenant. In the absence of any evidence otherwise establishing an obligation to pay such dues,[47] these payments would appear to be disguised personal expenses.

For the reasons elaborated upon above, we sustain respondent's disallowance of a deduction for each of the purported dues expenses for taxable years 2009–12. Moreover, we will not apply the *Cohan* rule given the lack of credible evidence.

F.  *Insurance Expenses*

At issue are various insurance expenses totaling $3,400; $2,343; $2,429; and $2,487 reported for taxable years 2009–12, respectively. We find that Mr. Tung adequately substantiated $1,843; $1,153; and $1,479 in premium payments by Genecure for a State Farm Insurance business liability policy ending in 020-0 for taxable years 2009, 2010, and 2012, respectively. These amounts were substantiated with invoices from the insurer as well as BB&T Bank account (-1487) statements confirming that such payments were actually made. Moreover, the business purpose of those expenses is self-evident.

We sustain respondent's disallowance as to the residual amounts, which correspond to premium payments by Genecure that Mr. Tung did not establish were ordinary and necessary business expenses.[48]

G.  *Office Supply Expenses*

At issue are $574; $643; $1,867; and $712 in purported office supply expenses for taxable years 2009–12, respectively. We find that

---

[47] The Court notes that the purported rental agreement (notwithstanding our earlier finding that it lacks credibility, *see supra* note 42) makes no mention of Genecure's obligation to pay for business park association dues.

[48] These include premium payments for insurance policies with TIAA and Teachers Insurance (which appear to be related, if not the same, entities). Mr. Tung testified at trial that these payments were for life insurance coverage for himself. We find that such payments constitute disguised personal expenses rather than Genecure business expenses and therefore are not deductible. *See* § 262(a). The disallowed amounts also include what appear to be premium payments for an auto insurance policy. There is no evidence in the record indicating the identity of the policy holder, nor is there any evidence that Genecure owned a vehicle to insure.

[*23] Mr. Tung substantiated only an $8 expense for envelopes in 2011 and a $10 expense for stamps in 2012. Consequently, we largely sustain respondent's disallowance of Genecure's reported office supply expense deductions except with respect to the aforementioned two expenses.[49]

### H. *Telephone and Internet Expenses*

At issue are $3,242; $3,284; $2,949; and $2,486 in purported telephone and internet expenses for taxable years 2009–12, respectively. The Court will permit as deductible business expenses only $1,327; $1,318; $1,338; and $1,429 for taxable years 2009–12, respectively. These amounts correspond to expenses paid for an AT&T account (ending in -1888) for internet and telecommunication (for a landline) services. This account was registered under Genecure's name and Norcross, Georgia, address. Mr. Tung substantiated the expenses associated with this account by producing the underlying invoices as well as BB&T Bank account (-1487) statements confirming payment. Moreover, we are persuaded that this account served a business purpose.

The disallowed amounts correspond to payments for telecommunication services associated with two T-Mobile accounts (ending in -0373 and -6172) and an additional AT&T account (ending in -1886). These accounts were registered under either Mr. or Mrs. Tung's individual name and their personal address in Georgia. Notwithstanding Mr. Tung's testimony that these accounts were used for business purposes, we do not find such self-serving testimony credible nor are we obliged to accept it. *See Tokarski*, 87 T.C. at 77. In the absence of any credible evidence demonstrating that these accounts were used in furtherance of Genecure's business, we find the payments in connection with these three accounts to be the Tungs' disguised personal expenses. Consequently, we will not permit Genecure to deduct them under section 162(a).[50] *See* § 262(a).

---

[49] Most of the evidence offered to substantiate the reported office supply expenses was not in fact for office supplies. It is possible that such expenses are deductible under some other category of business expense. However, we decline to act as Genecure's bookkeeper given the exceedingly voluminous and haphazardly organized record and will not correct the erroneous categorizations on its behalf. *See also* § 6001.

[50] The Court also notes that Mr. Tung testified that the two T-Mobile accounts (ending in -0373 and -6172) were for telecommunication services specifically for

**[\*24]** I.     *Travel Expenses*

In pertinent part, section 274(d) provides that no deduction claimed under section 162 shall be allowed for any traveling expense (including meals and lodging while away from home) unless the taxpayer satisfies certain heightened substantiation requirements. Those requirements permit a deduction for travel expenses only to the extent the taxpayer proves (1) the amount of each expenditure for traveling away from home, (2) the date of departure and return for each trip and the number of days spent on business, (3) the destination or locality of travel, and (4) the business reason for travel or the expected benefit to be derived from such travel. *See* Temp. Treas. Reg. § 1.274-5T(b)(2). This is a conjunctive standard (i.e., all elements must be met with respect to each trip).

At issue are Genecure's reported travel-related expenses totaling $5,424; $576; $1,845; and $6,560 for taxable years 2009–12, respectively. Although Mr. Tung produced a variety of receipts as well as credit card and checking account statements in an attempt to substantiate the amounts of these reported expenses, he failed to prove with respect to each trip (1) the dates of departure and return and the number of days spent on business, (2) the destination of travel, *and* (3) the business purpose (or the expected benefit). Mr. Tung therefore failed to satisfy the heightened substantiation requirements of section 274(d). Consequently, we sustain the disallowance of deductions for these reported travel expenses. Moreover, as these expenses are subject to section 274(d), the *Cohan* rule cannot be applied. *See* Temp. Treas. Reg. § 1.274-5T(a) (flush language).

---

cellular telephones and that he used at least one of the cellular phones in part for personal purposes. For taxable year 2009, cellular telephones constituted "listed property" under section 280F(d)(4)(A)(v). Consequently, expenses related to cellular telephones paid during that year were subject to the heightened substantiation requirements of section 274(d), *see* § 274(d)(4), which requires a taxpayer to substantiate with respect to the cellular telephone the amount of the expense, the amount of business use and total use, the date of each use, and the business purpose of each use, *see* Temp. Treas. Reg. § 1.274-5T(b)(6). Mr. Tung did not substantiate the 2009 expenses for the two T-Mobile accounts accordingly, thus providing an alternative basis for disallowing them. Section 280F was amended such that cellular telephones no longer constituted "listed property" for taxable years beginning after December 31, 2009. *See* Small Business Jobs Act of 2010, Pub. L. No. 111-240, § 2043, 124 Stat. 2504, 2560 (2010).

**[\*25]** J.     *Utility Expenses*

At issue are Genecure's reported utility expenses totaling $8,427; $6,679; $6,702; and $5,761 for taxable years 2009–12, respectively. These expenses relate to amounts owed for natural gas, electricity, and water for Genecure's principal place of business, 3150 Corners.

The Court finds that Mr. Tung substantiated most of the amounts reported for electricity and natural gas.[51]  Consequently, we conclude that Genecure may deduct as business expenses $5,575; $4,066; $4,390; and $4,221 for taxable years 2009–12, respectively.   Mr. Tung substantiated such expenses with the associated invoices from Georgia Power, Gas South, and Georgia Natural Gas, as well as BB&T Bank account (-1487) statements confirming payment.

The remaining expense amounts relate to purported water payments for which Mr. Tung produced several quarterly invoices. However, we do not find these invoices credible for purposes of substantiating the expenses.  First, we note that none of the invoices for water came directly from a relevant water management authority (presumably, the Gwinnett County Department of Water Resources). All of them came from Corners North Association.  We also note that the purported rental agreement makes no reference to the association's serving as an intermediary for water billing purposes (notwithstanding our earlier finding, *see supra* note 42, that the agreement lacks credibility).

Second, of the 14 invoices in the record for purported water expenses, 11 list as Corners North Association's address and telephone number the same address and telephone number as those for Genecure. They also identify Mr. Tung as the association's point of contact.  These overlapping details cause us to be suspicious of the veracity of these documents.

Further eroding the credibility of such evidence are blatant inconsistencies suggesting at best, inaccuracy, and at worst, fabrication. For example, with respect to taxable year 2012, there are two invoices for $637 for the period "2/22/2012 thru 6/21/2012" and with a payment due date of July 20, 2012.  One indicates use of 1,618 gallons of water; however, that figure is crossed out and overwritten with 11,222 gallons.

---

[51] The unsubstantiated amounts total $271 for 2010 for purported electricity expense and $280 for 2011 for purported natural gas expense.

[*26] The second also indicates use of 1,618 gallons but without any alterations in handwriting. Handwritten notes on both invoices claim they were paid with check No. 1221. Elsewhere in the record, Mr. Tung represents that check No. 1221 is only associated with the first invoice and that the second invoice amount was for $500 and paid with check No. 1224.

For the reasons elaborated upon above, we find that the purported water invoices lack credibility. In the absence of other evidence establishing the amounts Genecure owed and paid for water, we find that Mr. Tung failed to substantiate its purported water expenses. Moreover, we will not apply the *Cohan* rule to estimate Genecure's purported water expenses given the lack of credible evidence.

In sum, Genecure may deduct only $5,575; $4,066; $4,390; and $4,221 of the reported utility expenses for the respective years at issue. The Court sustains respondent's disallowance of any deduction for the residual amounts.

K.    *Tax Expenses*

Property tax payments may be deducted under section 162(a) to the extent they are ordinary and necessary business expenditures. *See Bello v. Commissioner*, T.C. Memo. 2001-56, 2001 Tax Ct. Memo LEXIS 72, at *17–19. At issue are $12,328 in purported property tax payments reported by Genecure as business expenses for taxable year 2011.

To substantiate such expenses, Mr. Tung produced (1) a copy of a check for $11,784 made out to Gwinnett County Tax Commissioner[52] and (2) a BB&T Bank account (-1487) statement for the period ending March 31, 2011, reflecting a $554 debit associated with check No. 1199 and a handwritten note next to it stating "(Tax)."[53] However, Mr. Tung did not produce the property tax assessment(s) or invoice(s) from Gwinnett County underlying these payments, nor did he ever identify the property to which these payments relate. Consequently, we are

---

[52] The "Memo" line of the check is illegible but appears to reference a string of numerals.

[53] We acknowledge that the sum of these amounts is $12,338 (i.e., $10 greater than the amount for tax expenses reported on the Form 1065 for 2011 and asserted on brief).

**[\*27]** unable to ascertain whether the expenses served a business purpose (as opposed to a personal one of Mr. and Mrs. Tung).[54]

The burden is on Mr. Tung to establish Genecure's entitlement to deductions, which requires inter alia substantiation as to both *amount and purpose.  See INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84; *Higbee*, 116 T.C. at 440.  Mr. Tung failed to produce such substantiation, and we therefore sustain the disallowance of any deduction for the property tax expenses reported for taxable year 2011.[55]

### L.    *Automobile Expense*

At issue is Genecure's reported automobile expense totaling $7,000 for taxable year 2012.  Mr. Tung did not elaborate on the nature of this expense other than that it related to an automobile and that it was effected through a single unidentified check allegedly drawn on Genecure's Piedmont Bank account (-2665).  Mr. Tung did not produce any invoice or check for $7,000, nor does a $7,000 debit appear on any of the Piedmont Bank account (-2665) statements in the record.  In the absence of any substantiating evidence regarding this expense, the Court sustains the disallowance of any deduction for the $7,000 automobile expense reported for 2012.  Moreover, the *Cohan* rule is inapplicable as passenger automobiles constitute listed property under section 280F(d)(4)(A)(i).  *See* Temp. Treas. Reg. § 1.274-5T(a) (flush language).

---

[54] Although the Court acknowledges a handwritten note on the purported lease agreement for 3150 Corners stating that the lessor (Genecure) "should" pay the property tax, the note on its own does not substantiate the purpose of the payments at issue.  Moreover, we previously concluded that this purported agreement is not credible evidence.  *See supra* note 42.

[55] We separately note that Genecure would not be entitled to a deduction under section 164(a)(1) for the tax payments even assuming that they were with respect to 3150 Corners.  Section 164(a), distinct from section 162(a), provides a deduction  for various state and local taxes paid, including real property tax, regardless of whether paid in connection with the taxpayer's trade or business.  The regulations promulgated thereunder state that such taxes are generally deductible only by the person upon whom they are imposed.  *See* Treas. Reg. § 1.164-1(a) (flush language).  However, this Court has previously held "that taxpayers who do not hold legal title to property but who establish they are equitable owners of the property  are entitled to deduct property tax paid by them for the property."  *See, e.g.*, *Abarca v. Commissioner*, T.C. Memo. 2012-245, at \*16.  Genecure did not possess legal title over 3150 Corners, and Mr. Tung did not allege (or produce evidence) that Genecure paid the property tax as the equitable owner of the property.

**[*28]** M. *Research and Development Expenses*

Section 174(a)(1) permits a taxpayer to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." It further provides that such expenses may be deducted.[56] "[R]esearch and experimental expenditures" are research and development costs in the experimental or laboratory sense and include incidental costs. *See* Treas. Reg. § 1.174-2(a)(1). Amounts which are paid to others for research or experimentation on the taxpayer's behalf may also be deducted under section 174(a)(1). *See* Treas. Reg. § 1.174-2(a)(8).

At issue are $56,279; $40,062; $44,179; and $98,477 in research and development expenses reported by Genecure for taxable years 2009–12, respectively.[57] Upon review of the evidence, we find that Mr. Tung substantiated $18,652; $31,350; $37,830; and $58,190 for taxable years 2009–12, respectively.

These amounts include expenses for laboratory supplies such as liquid nitrogen and pipettes, for which Mr. Tung produced numerous invoices from third parties and proof of payment.[58] They also include amounts paid for contracted research services rendered by UM[59] as well as amounts paid to GSU[60] pursuant to the collaborative research agreement executed in November 2008. Furthermore, we are persuaded

---

[56] Section 174(a)(1) thus enables cash method taxpayers to immediately deduct research and development expenses (in the taxable year paid) rather than capitalize them, which would result in depreciation or amortization expense deductions over a period of multiple taxable years.

[57] Respondent conceded $18,000 in payments to MPI for contracted research services for taxable year 2010. *See supra* notes 4, 37.

[58] Mr. Tung substantiated payment of such expenses largely through the production of various credit card statements.

[59] Mr. Tung substantiated payment of $22,722 and $41,926 to UM in taxable years 2011 and 2012, respectively, by producing copies of underlying invoices, as well as credit card statements confirming payment. These payments were for a clinical trial study to evaluate the safety and immunogenicity of Genecure's HIV vaccine.

[60] Mr. Tung substantiated payment of $10,000; $20,000; $10,000; and $10,000 by Genecure to GSU in taxable years 2009–12, respectively. Mr. Tung produced copies of the underlying checks each of which referenced "ALW95" (a project sponsored by Genecure pursuant to the collaborative research agreement), as well as corroborating BB&T Bank account (-1487) and Piedmont Bank account (-2665) statements confirming payment.

**[\*29]** that these expenses were paid by Genecure in connection with its HIV vaccine research and development.

In sum, Genecure may deduct only \$18,652; \$49,350;[61] \$37,830; and \$58,190 of the original amounts reported for research and development expenses under section 174(a)(1) for taxable years 2009–12, respectively. We sustain respondent's disallowance of the residual amounts.[62]

VI.     *QTDP Grant Recapture*

Section 48D permits taxpayers to claim a credit (or receive a grant in lieu of a credit) equal to 50% of the qualified investment a taxpayer makes with respect to a QTDP in a taxable year beginning in 2009 or 2010. Subject to certain limitations and exclusions, "qualified investment" is defined as "the aggregate amount of the costs paid . . . for expenses necessary for and directly related to the conduct of a qualifying therapeutic discovery project." § 48D(b)(1), (2), and (3).

However, ACA § 9023(e)(5)(B)(i), 124 Stat. at 882, further provides:

> Recapture of excessive grant amounts.—If the amount of a grant made under this subsection exceeds the amount allowable as a grant under this subsection, such excess

---

[61] This amount comprises the \$31,350 substantiated by Mr. Tung and the \$18,000 conceded by respondent (for payments to MPI).

[62] A significant portion of the evidence offered by Mr. Tung to substantiate Genecure's research and development expenses included amounts paid for meals, premiums for unidentified insurance policies, and airfare. However, Mr. Tung failed to establish how such expenses were paid in connection with Genecure's research and development activity such that they are deductible under section 174(a)(1) as incidental costs. *See* Treas. Reg. § 1.174-2(a)(1) ("The term *research or experimental expenditures*, as used in section 174, . . . generally includes all such costs incident to the development . . . of a product.").

Moreover, to the extent we sustain the disallowance of deductions for actual research and development expenses, we note that such expenses are limited to a subset of those reported for taxable year 2009. These expenses were paid by credit card at the end of taxable year 2008, but the corresponding credit card statement was paid off in early taxable year 2009. In such a scenario, the year of deductibility is determined by the taxable year in which the credit card charge is made regardless of when the credit card issuer is repaid. *See Schroeder v. Commissioner*, T.C. Memo. 1986-583, 1986 Tax Ct. Memo LEXIS 23, at \*13–14. Consequently, these expenses may be deducted only for taxable year 2008—a year for which we lack jurisdiction to readjust partnership items in this proceeding. *See* § 6226(f).

**[\*30]** shall be recaptured under subparagraph (A) as if the investment to which such excess portion of the grant relates had ceased to be a qualified investment immediately after such grant was made.

This provision of the ACA requires recapture of an excess portion of a QTDP grant in the taxable year the grant was actually disbursed. *See Silver Med., Inc. v. Commissioner*, 147 T.C. 547, 554–56 (2016). A portion of a grant is excess to the extent the qualified investment for which it was awarded (i.e., the amount certified by the IRS upon its review of the participating taxpayer's Form 8942) was not actually paid.[63] *See Wang v. Commissioner*, T.C. Memo. 2017-81, at \*21–22. Furthermore, recapture is effected in the form of an increase in federal income tax equal to the excess portion of the grant. *See* ACA § 9023(e)(5)(A), 124 Stat. at 882; *Wang*, T.C. Memo. 2017-81, at \*21–22.

In this case, Genecure received $244,479 in the form of a QTDP grant attributable to $488,958 of certified qualified investment expenses for taxable year 2009. Respondent concedes that Genecure paid for $27,000[64] worth of qualified investment in taxable year 2009, but he argues that Mr. Tung has not substantiated any other qualified investment in excess of that amount. Mr. Tung argues that Genecure made qualified investments in taxable years 2009 and 2010 totaling (1) $670,000 in wages; (2) $144,484 in supplies and lab costs; (3) $30,502 in "other costs"; (4) $451,149 in third-party (research) contract costs; and (5) $240,000 in depreciable property costs.[65] Upon review of the evidence cited by Mr. Tung, we agree with respondent.

As a preliminary matter, we reiterate that although Genecure applied for the grant with respect to purported qualified investments for taxable years 2009 and 2010, the $244,479 QTDP grant it ultimately

---

[63] For IRS certification purposes, qualified investment included not only expenses actually paid as of the date of application, but also expenses a taxpayer seeking a QTDP grant expected to pay in the remainder of its taxable year beginning in 2009 or 2010. *See* I.R.S. Notice 2010-45, § 5.02(6), 2010-23 I.R.B. at 736. However, certification of qualified investments by the IRS did not constitute a determination that the costs reported were or would be in fact paid. *See id.* § 7.04, 2010-23 I.R.B. at 737.

[64] This amount was a single payment to MPI in taxable year 2009 and relates to the toxicity study of its HIV vaccine in rats.

[65] The aggregate sum of these amounts is $1,536,135, which is significantly less than the $1,660,000 Genecure reported when it applied for the grant. *See supra* Findings of Fact Part II.

**[\*31]** received was attributable to amounts reported for taxable year 2009, which the parties stipulated. On brief, Mr. Tung contends that the grant was attributable to qualified investments reported for both 2009 and 2010. The Court declines to entertain Mr. Tung's more recent and inconsistent position as justice does not require the Court to release him from the binding effect of the stipulation. *See* Rule 91(e). Mr. Tung has offered no justification for doing so. Moreover, I.R.S. Notice 2010-45, § 5.02(10), 2010-23 I.R.B. at 737, requires that if (1) a taxpayer requests a grant for both 2009 and 2010 and (2) the aggregate qualified investment ultimately certified is less than that reported, then the amount certified must first be attributed to 2009 before 2010. As $488,958 is less than the $600,000 reported for taxable year 2009, no amount certified may be attributed to taxable year 2010. Thus, in order to avoid recapture tax, Mr. Tung must prove that Genecure actually paid for an additional $461,958 in qualified investment in taxable year 2009.[66]

Mr. Tung failed to substantiate payment of any qualified investment expense in taxable year 2009 beyond the $27,000 respondent conceded. With respect to the $670,000 purportedly paid for wages, none of the evidence cited by Mr. Tung for this amount substantiates any payment for wages.[67] Moreover, Mr. Tung cited no evidence with respect to the $144,484 in supplies and lab costs nor with respect to the $30,502 in "other costs."

With respect to the purported $451,149 in third-party contract expenses, Mr. Tung claims that $406,149 is attributable to payments associated with the UM contract and that the residual $45,000 is attributable to payments associated with the MPI contract. As to the $406,149, none of the evidence cited by Mr. Tung substantiates that Genecure paid such amounts to UM in taxable year 2009.[68] As to the

---

[66] This sum represents the $488,958 in qualified investment initially certified by the IRS less the $27,000 conceded by respondent. We note nonetheless that Genecure reported $600,000 in qualified investment expenses for taxable year 2009 when it applied for the grant.

[67] The evidence in question is (1) a purported employment agreement between Genecure and Mr. Tung executed on January 1, 1999, and (2) a purported letter dated July 1, 1999, from Genecure offering employment to Mrs. Tung.

[68] Mr. Tung cites to UM's response to a subpoena issued by the IRS during the examination. The documents included in the response indicate that UM did not receive any payments in 2009 for any invoices issued to Genecure for the clinical trial study, which totaled $64,648.

**[*32]** remaining $45,000 paid to MPI for the toxicity study in rats, respondent has already conceded $27,000.[69] The residual $18,000 was paid in taxable year 2010, not 2009.

Lastly, with respect to the purported $240,000 in depreciable property expenses (all apparently attributable to construction and certification of a clean room for vaccine production), none of the evidence offered by Mr. Tung substantiates payment of that amount by Genecure in taxable year 2009.[70]

In sum, Mr. Tung failed to substantiate qualified investment expenses in taxable year 2009 in excess of $27,000. Consequently, Genecure was entitled to a QTDP grant of only $13,500 (i.e., 50% of its qualified investment), and the excess grant amount, $230,979,[71] is subject to recapture in taxable year 2010. *See* ACA § 9023(e)(5)(B)(i), 124 Stat. at 882; *Silver Med., Inc.*, 147 T.C. at 554–56.

VII. *Purported Loan and Capital Contribution from Mrs. Tung*

At issue are two alleged transactions between Genecure and Mrs. Tung reflected on Genecure's Form 1065 for taxable years 2009 and 2011. The first of these transactions concerns a purported $200,000 loan from Mrs. Tung in 2009, which was Genecure's only reported liability as of the taxable yearend. The second of these transactions concerns a

---

UM also acknowledged having received a $250,000 check dated December 1, 2010, from Genecure on or about July 2, 2012. The check was written from Genecure's Piedmont Bank account (-2665). A statement from that account for the period ending July 31, 2012, indicates that UM deposited the check sometime that month. Notwithstanding the check date, Genecure's Piedmont Bank account (-2665) never had an average balance exceeding $152,000 between December 2010 and August 2011. Moreover, Mr. Tung offered no credible testimony at trial as to the purpose of this payment, nor is there an invoice in the record associated with this check. We find particularly noteworthy that the purported date of the check (i.e., December 2010) predates the execution of the underlying contract (i.e., July 2011) by over six months. Regardless of whether this $250,000 transfer constitutes a qualified investment, it did not occur in taxable year 2009 and is therefore irrelevant for purposes of substantiating the QTDP grant at issue.

As to the outstanding $91,501 of the $406,149 in alleged payments to UM, Mr. Tung offered no evidence to substantiate this amount.

[69] The record nonetheless confirms that payment of $27,000 to MPI for the contracted study occurred in taxable year 2009.

[70] To the extent Mr. Tung produced invoices and corresponding proof of payment, such expenses were all paid in taxable year 2006.

[71] This sum represents the $244,479 received less the $13,500 duly entitled.

**[\*33]** purported $100,000 capital contribution to Genecure from Mrs. Tung in 2011. Mr. Tung did not offer any credible evidence substantiating these purported transactions.

With respect to the purported $200,000 loan from Mrs. Tung, Mr. Tung offered as evidence the same purported promissory note he offered to substantiate purported rent expenses.[72] *See supra* Opinion Part V.A. As noted previously, the purported note created an obligation to someone other than Mrs. Tung. It is therefore incomprehensible how this note substantiates a purported loan from Mrs. Tung. Furthermore, it contains no interest rate, maturity date, or other term or covenant beyond Genecure's promise to pay. The omission of such critical terms casts serious doubt as to the credibility of this evidence for purposes of substantiating any debt obligation whatsoever. In the absence of any credible evidence of a $200,000 loan from Mrs. Tung, we sustain respondent's determination.

With respect to the purported $100,000 capital contribution from Mrs. Tung, Mr. Tung offered as evidence a copy of Genecure's BB&T Bank account (-1487) statement for the period ending August 31, 2011, and a BB&T Bank wire transfer notice issued to Genecure for the same account. The statement for the period indicates that a total of $100,000 was credited to Genecure's BB&T Bank account (-1487), but it does not identify the source of the credited funds nor whether they came from one or multiple sources. However, the wire transfer notice establishes that the $100,000 is attributable to a single source—"Lin Yin, Hsiang-Fen"—and that it was credited on August 31, 2011. Taken together, this evidence substantiates only a $100,000 capital contribution from Hsiang-Fen in taxable year 2011, which is reflected on the Schedule K–1 for Hsiang-Fen included with Genecure's Form 1065 for that year. In the absence of any other evidence of a $100,000 capital contribution from Mrs. Tung, we sustain respondent's determination.

In sum, we find that Mr. Tung failed to substantiate the purported $200,000 loan and the purported $100,000 capital contribution from Mrs. Tung in taxable years 2009 and 2011, respectively.

---

[72] For purposes of this discussion, we disregard the nuance between a loan and a promissory note as they are both reported as liabilities on Form 1065.

**[\*34]** VIII.   *Section 6663 Civil Fraud Penalties*

At issue are section 6663 civil fraud penalties determined against Genecure for taxable years 2009–12.[73]   Because respondent does not bear the burden of production with respect to penalties in a partnership-level proceeding, *see Dynamo Holdings Ltd. P'ship*, 150 T.C. at 236, Mr. Tung was required to plead respondent's noncompliance with section 6751(b)(1) (requiring written supervisory approval for the assessment of penalties) as an affirmative defense if he wished to raise that issue, *see Blossom Day Care Ctrs., Inc. v. Commissioner*, T.C. Memo. 2021-87, at \*57.   Mr. Tung did not do so in the Petition.

We nonetheless deem noncompliance with section 6751(b)(1) pleaded as an affirmative defense to the section 6663 penalties, as the issue was actually tried by implied consent of the parties.   *See* Rule 41(b)(1) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").   Respondent called as witnesses RA White and RA Kittrell, who were each cross-examined by Mr. Tung.   Moreover, both parties introduced documentary evidence concerning this issue.   Consequently, before reaching the merits of the asserted fraud penalties, the Court must address whether the IRS complied with section 6751(b)(1).

A.    *Section 6751(b)*

Section 6751(b)(1) provides that no penalty, including the penalty under section 6663, may "be assessed [against a taxpayer] unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."

1.    *Initial Determination*

The Code does not define "initial determination."   *See Graev v. Commissioner*, 149 T.C. 485, 500, 503 (2017) (Lauber, J., concurring)

---

[73] Although Genecure is not a taxable entity for federal income tax purposes, *see* § 701, TEFRA confers on this Court jurisdiction to determine the applicability of section 6663 penalties in partnership-level proceedings, *see* § 6226(f); *United States v. Woods*, 571 U.S. 31, 39–42 (2013); *see also Omega Forex Grp., LC v. United States*, 906 F.3d 1196, 1211–12 (10th Cir. 2018) (sustaining trial court determination that it had jurisdiction in a TEFRA case to review the applicability of civil fraud penalties in light of section 6226(f) and *Woods*).

**[\*35]** (Holmes, J., concurring in result), *supplementing and overruling in part* 147 T.C. 460 (2016). Nonetheless, in a partnership-level proceeding under TEFRA, section 6751(b)(1) generally requires that written supervisory approval of a penalty determination occur no later than the issuance of the FPAA. *See Palmolive Bldg. Inv'rs, LLC v. Commissioner*, 152 T.C. 75, 83 (2019). In *Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021), however, this Court held that written supervisory approval may be required by a date earlier than the issuance of a notice of deficiency (and analogously, an FPAA) if there is an earlier formal communication to the taxpayer advising him of the penalty determination and of his right to appeal. Regardless, the "initial determination" for purposes of section 6751(b)(1) must reflect, in a formal writing, that the IRS Examination Division "completed its work and made an unequivocal decision to assert penalties." *See Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 15 (2020) (rejecting the taxpayer's argument that a Letter 1807 communicating proposed penalties constituted the initial determination for purposes of section 6751(b)(1)). Moreover, notwithstanding the Court's holding in *Clay*, conferral of appeal rights is not the sine qua non of an initial determination, although it may be an indication of it. *See Beland v. Commissioner*, 156 T.C. 80, 89 (2021).

Respondent argues that for purposes of section 6751(b)(1), the FPAAs issued on April 9, 2015, constitute the initial determination. Conversely, Mr. Tung asserts that the Letter 1807 issued on February 20, 2015, constitutes the initial determination.

We conclude that the initial determination is embodied in the FPAAs issued on April 9, 2015, as they collectively constitute the first formal communication advising Genecure of the penalty determinations at issue and of its right to appeal such determinations. *See Beland*, 156 T.C. at 89; *Clay*, 152 T.C. at 249. The Letter 1807 in this case cannot constitute the "initial determination" for the same reason the Court in *Belair Woods* found a similar Letter 1807 insufficient. That is, the Letter 1807 (dated February 20, 2015) merely communicated proposed penalties the ultimate imposition of which was subject to further discussion and consideration (at the closing conference). Consequently, it did not indicate that the Examination Division had completed its work and that an unequivocal decision to assert penalties had been made. *See Belair Woods, LLC*, 154 T.C. at 11–15. Thus, in order to satisfy section 6751(b)(1), written supervisory approval had to be obtained on or before April 9, 2015.

**[\*36]**       2.       *Approval in Writing*

There is no singular form on which written supervisory approval must be recorded for purposes of section 6751(b)(1) as long as the writing manifests the immediate supervisor's intent to approve the penalty at issue. *See Tribune Media Co. v. Commissioner*, T.C. Memo. 2020-2, at \*20–21. This Court has found the written supervisory approval requirement satisfied by several forms of documentation that were timely signed by an immediate supervisor, including (1) a Civil Penalty Approval Form, *see, e.g., Belair Woods, LLC*, 154 T.C. at 16–17, and (2) a Form 11661, *see Benavides & Co., P.C. v. Commissioner*, T.C. Memo. 2019-115, at \*45.

In this case, both a Civil Penalty Approval Form and a Form 11661 were signed before the issuance of the FPAAs on April 9, 2015. Nonetheless, Mr. Tung argues that these signed forms fail to satisfy the written supervisory approval requirement. With respect to the Civil Penalty Approval Form, he argues that the approval relates to the assertion of the section 6663 penalties against himself and Mrs. Tung individually rather than against Genecure. With respect to the Form 11661, he argues that Ms. Fontanes was not the immediate supervisor of RA White.[74] We address each form in turn.

a.       *Civil Penalty Approval Form*

The Civil Penalty Approval Form consists of two pages and was signed by Ms. Smith on March 19, 2015. An "x" is marked for a box to assert the section 6663 fraud penalty. An "x" is also marked next to a box containing the following text: "Deficiency Case (Explanation required when adjustments made and penalties are not asserted. The applicable exceptions to the penalty must be documented.)." On the top of both pages are identical headers indicating Mr. and Mrs. Tung in the field for "Taxpayer Name"; a taxpayer identification number (TIN);[75] 1040 in the field for "Tax Form"; and 2009–12 in the field for "Tax Year(s)." The form also includes narrative entries by RA White and RA

---

[74] The Form 11661 at issue references only taxable years 2009–11. Respondent conceded that it does not provide supervisory approval as to taxable year 2012.

[75] The TINs disclosed on the headers do not match the Employer Identification Number (EIN) for Genecure disclosed elsewhere throughout the record; however, they do match the TINs for Mr. and Mrs. Tung. To the extent the record includes inadvertent disclosure of sensitive taxpayer information (that the Court is aware of), we ordered on May 5, 2022, that the parties file redacted versions of certain filings in accordance with Rule 27(a).

[*37] Kittrell which refer to both Genecure and Mr. and Mrs. Tung. In weighing these various aspects of the document, we cannot conclude that this form manifests Ms. Smith's intent to approve the assertion of the section 6663 penalties against Genecure.

The Civil Penalty Approval Form's headers establish a clear and unambiguous context by identifying the Tungs individually by name and by TIN. The reference to Form 1040 (the IRS form for *individual* returns) is consistent with the identification of the Tungs as the subject of the form rather than Genecure (which filed partnership returns on Form 1065). The "x" marked for the box referring to "Deficiency Case" also supports the conclusion that the context for this form is the examination of individual returns; the examination of partnership returns does not result in income tax deficiency determinations as partnerships are not subject to federal income tax. *See* §§ 701, 6211(a). To the extent the narrative entries reference Genecure, they do not explicitly state that the penalties should be asserted against it. When contextualized against the headers and other details on the Form, they appear to be surplusage in explaining the applicability of the penalties as to Mr. and Mrs. Tung. Consequently, we hold that the Civil Penalty Approval Form does not manifest Ms. Smith's intent to approve section 6663 penalties *against Genecure. See Tribune Media Co.*, T.C. Memo. 2020-2, at *20–21. It therefore does not satisfy the written approval requirement.[76] *See id.*

b.      *Form 11661*

The Form 11661 consists of two pages and was signed by Ms. Fontanes on August 7, 2012. Genecure is listed in the field "Business Name" within the broader field for "Assigned Taxpayer."[77] Under the field for "Taxpayer Identification Number" is a redacted entry within the subfield "EIN."[78] The form indicates that the relevant returns under examination are Forms 1065 for taxable years 2009–11. Within the field

[76] We note that the headers provide an essential context not only as to the identity of the subject taxpayers but also as to the relevant taxable years. There is no indication of the taxable years to which the penalty assertion is being made other than the headers. If the Court ignores the context the headers establish as to the identity of the subject taxpayers, logic would similarly compel us to ignore them as to the relevant taxable years to which the penalty assertion relates.

[77] The other subfields within "Assigned Taxpayer" are "Last Name" and "First Name"; both subfields were left blank.

[78] The other subfield within "Taxpayer Identification Number" is "SSN," which was left blank.

**[\*38]** for "FTA Recommendation,"[79] there is no "x" marked next to the box "Assert CFP/FFTFP/impose 10-year EITC Ban"; a footnote on the form indicates that "CFP" stands for civil fraud penalty. The only reference to penalties on this form is the aforementioned footnote. Lastly, in the two fields available for narrative entries, there is no statement reflecting a determination that the section 6663 penalties should be asserted against Genecure. In weighing these aspects of the Form 11661, we also cannot conclude that this writing manifests an intent to approve the imposition of any section 6663 penalty. *See Tribune Media Co.*, T.C. Memo. 2020-2, at \*20–21.

A Form 11661 is used to document the investigation of potential fraud. *See* IRM 25.1.2.2 (Oct. 30, 2009). It does not necessarily reflect a determination that fraud exists or that any fraud-related penalty or addition to tax should be imposed against the target taxpayer. *See id.*

Although this Court found the written approval requirement satisfied by Forms 11661 with respect to an individual and corporate taxpayer in *Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*45, that consolidated case is distinguishable.[80] The Court determined as a finding of fact that the Form 11661 for the individual taxpayer evinced the examining agent's recommendation that civil fraud penalties should be asserted, and the Court noted that the "Plan of Action" therein stated that a 30-day letter would be prepared *that included the civil fraud penalty. Id.* at \*11, \*45–47. The Court found that the Form 11661 for the corporate taxpayer similarly evinced supervisory approval of the examining agent's recommendation to assert civil fraud penalties. *Id.* at \*46.

The Form 11661 in the present action contains none of the same characteristics, and to the extent there is any mention of penalties, such a reference was solely for the purpose of disclosing the meaning of an abbreviation on the underlying form.

As we find no indication that this form (as completed) recommended the assertion of the section 6663 penalty against

---

[79] "FTA" stands for fraud technical advisor. *See Internal Revenue Manual* (IRM) 25.1.1.1(6) (Dec. 16, 2011).

[80] Also at issue was a civil fraud penalty determination against a third taxpayer; however, the Court did not address whether the IRS complied with section 6751(b)(1) with respect to her because it concluded that the government did not carry its burden of establishing that she had fraudulent intent. *See Benavides & Co., P.C.*, T.C. Memo. 2019-115, at \*45–46.

**[\*39]** Genecure, we hold that it does not satisfy the written supervisory approval requirement of section 6751(b)(1).[81]

In sum, we hold that neither the Civil Penalty Approval Form nor the Form 11661 at issue satisfies the written supervisory approval requirement for purposes of section 6751(b)(1). Consequently, the section 6663 civil fraud penalties are not applicable against Genecure at the partnership level. *See* § 6751(b)(1).

IX.    *Respondent's Untimely Opening Capital Account Balance and Outside Basis Argument*

At trial, respondent raised as an issue for the first time Genecure's opening tax-basis capital account balances reported for taxable year 2009.[82] Respondent further articulates on brief that because Mr. Tung cannot substantiate the opening tax-basis capital account balances reported on Genecure's returns, each partner's outside basis must be deemed to be zero for purposes of applying the section 704 loss limitation rule.[83]

The opening tax-basis capital account balance and outside basis issue was not raised in the FPAA for taxable year 2009 or in respondent's Answer. Similarly, respondent's Pretrial Memorandum made no mention of this issue. Consequently, Mr. Tung had no notice or reason to prepare evidence for trial that would substantiate the partners' opening tax-basis capital account balances or outside bases (the latter of which is not a return item reported on Form 1065 or associated Schedule(s) K–1). We will not entertain respondent's argument as to this issue given the lack of notice and consequent prejudice. This Court has held on multiple occasions that we will not consider an issue raised for the first time at trial (or on brief) for this very reason. *See, e.g.*, *Estate of Mandels v. Commissioner*, 64 T.C. 61, 73 (1975); *Friedman v. Commissioner*, T.C. Memo. 1992-588, 1992 Tax Ct. Memo LEXIS 606, at \*10–12, *aff'd without published opinion*, 48

---

[81] We decline to address Mr. Tung's argument that Ms. Fontanes was not RA White's immediate supervisor for purposes of section 6751(b)(1), as this holding renders it moot.

[82] As best we understand respondent's overall argument, his issue lies with the opening capital account balances reported on the Schedules K–1, which Genecure indicated therein were tax-basis figures.

[83] Section 704(d) limits the deductibility of a passed-through loss to a partner's adjusted basis in his partnership interest (i.e., outside basis) at taxable yearend.

[*40] F.3d 535 (11th Cir. 1995); *Energy Res. Ltd. P'ship v. Commissioner*, T.C. Memo. 1990-240, 1990 Tax Ct. Memo LEXIS 248, at *6.

To the extent respondent may claim that Mr. Tung was placed on notice of this issue by language in the 2009 FPAA stating that Genecure failed to provide support to verify capital contributions made during taxable year 2009 that would increase basis, we disagree.[84] A capital contribution made during a taxable year is distinct from a capital account balance entering the same year, and substantiating each would require wholly separate bodies of evidence. Moreover, although the FPAA language references the word "basis," the determination itself is not that the partners' outside bases should be zero.

Notwithstanding our conclusion that this issue was not timely raised, respondent's argument fails on the merits as it is predicated on his apparent conflation of a partner's tax-basis capital account with such partner's outside basis in a partnership. A partner's outside basis is defined under section 705(a), and Treasury Regulation § 1.705-1(a)(1) explicitly provides that it is determined without regard to any amount shown in a partnership's books as the partner's capital account. While related concepts, they are not synonymous.[85] *See* William S. McKee et al., *Federal Taxation of Partnerships and Partners* ¶ 6.04 (2022).

Moreover, this Court lacks subject matter jurisdiction to determine a partner's outside basis in a partnership-level proceeding. *See Woods*, 571 U.S. at 42 (holding that outside basis is not a partnership item for purposes of section 6226(f)); *see also Logan Tr. v. Commissioner*, 616 F. App'x 426, 429 (D.C. Cir. 2015), *aff'g in part, rev'g in part, and remanding Tigers Eye Trading, LLC v. Commissioner*, 138 T.C. 67 (2012).

---

[84] Respondent conceded this determination at trial stating that "[t]here are no capital contributions reported on Gene[c]ure's 2009 Form 1065." *See supra* note 7.

[85] Although (1) a partner's outside basis can generally be calculated by adding his share of partnership liabilities to his tax-basis capital account, *see Markell Co. v. Commissioner*, T.C. Memo. 2014-86, at *3 n.3, and (2) we previously concluded that Mr. Tung failed to substantiate a purported $200,000 loan from Mrs. Tung (the only liability reported as of taxable yearend 2009) to Genecure, *see supra* Opinion Part VII, respondent's argument also assumes without explanation that there were no adjustments to the tax-basis capital accounts between the start and end of the taxable year (such as one attributable to an allocation of partnership income or loss).

**[\*41]** X.      *Conclusion*

In conclusion, the Court holds: (1) that Genecure had unreported income of $6,000; $21,578; and $7,000 in taxable years 2009–11, respectively, (2) that Mr. Tung largely failed to establish Genecure's entitlement to deductions for various business expenses reported for each of the taxable years at issue, (3) that Genecure is subject to a $230,979 recapture tax with respect to its taxable year 2010 for excess amounts received as a QTDP grant, (4) that Mr. Tung failed to substantiate a $200,000 loan to Genecure from Mrs. Tung in taxable year 2009, (5) that Mr. Tung failed to substantiate a $100,000 capital contribution to Genecure from Mrs. Tung in taxable year 2011, and (6) that Genecure is not liable for section 6663 civil fraud penalties at the partnership level for any of the taxable years at issue.

We have considered all of the arguments made by the parties, and to the extent not mentioned above, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing,

*Decision will be entered under Rule 155.*